UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARIA ALVES, individually, and on behalf of all others similarly situated,

       Plaintiff,

 v.

AFFILIATED HOME CARE OF PUTNAM, INC., and BARBARA KESSMAN, in her individual capacity,

       Defendants.

No. 16-CV-1593 (KMK)

OPINION & ORDER

Appearances:

Daniel C. Stafford, Esq.
McCabe & Mack LLP
Poughkeepsie, NY
*Counsel for Plaintiff*

Nathaniel K. Charny, Esq.
Charny & Associates
Rhinebeck, NY
*Counsel for Plaintiff*

Steven Felsenfeld, Esq.
Law Offices of Robert Hilpert
Croton-on-Hudson, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

  Maria Alves ("Plaintiff") brings this collective Action on behalf of herself and others similarly situated against Affiliated Home Care of Putnam, Inc. ("Affiliated") and Barbara Kessman (collectively, "Defendants"), seeking to recover overtime compensation pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., and Article 6 of the New York State Labor Law. (*See* Am. Compl. ¶ 1 (Dkt. No. 10).) Defendants bring a Counterclaim against

Plaintiff for breach of contract. (*See* Answer to Am. Compl. ¶¶ 102–32 ("Counterclaim") (Dkt. No. 11).) Before the Court is Plaintiff's Motion To Dismiss Defendants' Counterclaim pursuant to Federal Rule of Civil Procedure Rule 12(c). (*See* Dkt. No. 27.) For the reasons to follow, Plaintiff's Motion is denied.

## I. Background

### A. Factual Background

As the Court has already provided a comprehensive discussion of the facts of this Action in its February 8, 2017 Opinion & Order, (*see* Op. & Order 2–3 (Dkt. No. 33)), it declines to do so here. Thus, the below facts relate only to the pending Motion, are taken from Defendants' Counterclaim, and are assumed true for the purpose of resolving the Motion.

"Plaintiff approached Affiliated seeking employment as a [Personal Care Aide ('PCA')] with it, on or about October 2, 2006." (Counterclaim ¶ 102.)[1] On October 6, 2006, "as a condition of . . . [e]mployment," Plaintiff entered into a contract with Affiliated, "wherein she agreed 'not to accept employment, either directly or indirectly from any client of Affiliated to whom [she had] been assigned, for at least 90 days after the last day of [her] assignment.'" (*Id.* ¶ 103.) From April 1, 2013 to November 4, 2015, Plaintiff "was assigned to provide services . . . to Aida Goncalez, a client of Affiliated." (*Id.* ¶ 105.)

From April 1, 2013 to July 1, 2014, Ms. Goncalez' Medicaid insurance carrier, Fidelis Care, was billed by Affiliated at a rate of $22.00 per hour, during which time Plaintiff was paid $14.00 per hour. (*See id.* ¶¶ 106, 108.) On July 1, 2014, the rate billed to Fidelis Care was

---

[1] As noted in the Court's prior Opinion & Order, "Defendants make much of the distinction between Personal Care Aides ('PCAs') and Home Health Care Aides ('HHAs')." (Op. & Order 10 n.5.) For the purpose of resolving the instant Motion, the distinction between them is immaterial.

reduced to $18.55. (*See id.* ¶ 107.) Defendants informed Plaintiff that as a result of this reduction, her rate of pay would be reduced to $13.00 per hour. (*See id.* ¶ 109.) As an "[a]lternative to a reduction in her pay, [D]efendants offered [P]laintiff reassignment to a higher compensating client," but Plaintiff chose to continue providing services to Ms. Goncalez at the rate of $13.00 per hour. (*Id.* ¶¶ 110–12.)

In early October 2015, Ms. Goncalez' daughter, Christine Bleakley, contacted Defendants to request that the aide servicing her mother be compensated at a higher rate. (*See id.* ¶ 114.)[2] Defendants responded that they were unable to do so because of the reduction in the rate billed to Fidelis Care. (*See id.*) Ms. Bleakley "offered that she would have to find another agency that would pay more money to the girls hourly" and that she "would like to take [P]laintiff." (*Id.* ¶ 115 (alteration and internal quotation marks omitted).) Ms. Bleakley "confirmed that she was aware of [P]laintiff's [c]ontract, but asked [D]efendants . . . [to] send her a copy of the signed [c]ontract," which Defendants did. (*Id.* ¶ 116.) Ms. Bleakley "acknowledged [that] she understood the [c]ontract," but asked Defendants to break it. (*Id.* ¶ 117.) Defendants declined to do so, and Ms. Bleakley stated that "she would 'abide' by the [c]ontract and not hire [P]laintiff." (*Id.* ¶ 118.) Ms. Bleakley also told Defendants that "she had approached a competitor of Affiliated, Concepts of Independence, Inc. ('COI'), secured for the 'girls' an increase in remuneration of one ($1) dollar per hour over what [P]laintiff was being paid at Affiliated, and had agreed to direct Ms. Goncalez to COI as her care provider." (*Id.*)

---

[2] Defendants' Counterclaim appears to omit a portion of the first clause in paragraph ¶ 114. (*See* Counterclaim ¶ 114 ("In or about early October 2015, . . . Ms. Goncalez' daughter contacted [D]efendants and asked that the PCA[]s servicing her mother; to which [D]efendants responded they had seen their rate cut by Fidelis Care, and so could not give the PCA[]s any more money.").) The Court assumes from the subsequent clause that the request made by Ms. Goncalez' daughter was that Defendants pay the PCAs a higher rate.

3

On November 4, 2015, Ms. Goncalez left the care of Affiliated and became a client of COI. (*See id.* ¶ 119.) The following day, Affiliated wrote to Ms. Bleakley to remind her that she "[could not] take any of Affiliated['s] employees for 90 days," because "[t]hey each [had] a non-compete clause in their contract with Affiliated." (*Id.* (internal quotation marks omitted).) An employee of Affiliated informed Defendants that she had seen Plaintiff's truck at Ms. Goncalez' home between November 4 and December 4, 2015. (*See id.* ¶ 121.)[3] On December 4, 2015, "[P]laintiff contacted [D]efendants by telephone to inform [them] she was going to 'take a break' from her [e]mployment and would not be working for a while." (*Id.* ¶ 122.) Defendants did not contest Plaintiff's decision to "take a break," but reminded Plaintiff that she "signed a [c]ontract with Affiliated that [she] could not work on the same client for 90 days." (*Id.* ¶ 123 (internal quotation marks omitted).) Defendants added that "[a]fter the 90 days, if [she] ch[]ose to, [she] [could] go back to that same client." (*Id.* (internal quotation marks omitted).) Plaintiff told Defendants that she understood these terms. (*See id.* ¶ 124.)

Defendants allege that "on or about December 5, 2015 (if not in the weeks immediately prior thereto), [P]laintiff began employment with COI," "in direct competition with, and to the detriment of, Affiliated." (*Id.* ¶¶ 125, 127.)[4] On December 9, 2015, Defendants' general counsel informed Plaintiff in writing that she was in breach of her contract with Affiliated. (*See id.* ¶ 126.)

Defendants allege that Plaintiff has "violated her signed [c]ontract not to accept employment, either directly or indirectly from any client of Affiliated to whom she had been

---

[3] It is unclear from Defendants' pleading when the Affiliated employee relayed this information to Defendants.

[4] Defendants assert that "[u]pon information and belief," as of the date of their Counterclaim, Plaintiff was still employed by COI. (Counterclaim ¶ 127.)

assigned" and that as a result of Plaintiff's purported breach, Affiliated has been damaged in the amount of $40,068.00 of loss of income. (*Id.* ¶¶ 128–30 (alteration and internal quotation marks omitted).)[5]

B. Procedural History

Plaintiff filed her original Complaint on March 2, 2016, (*see* Dkt. No. 1), and Defendants filed an Answer on May 2, 2016, (*see* Dkt. No. 9). Plaintiff filed an Amended Complaint on May 12, 2016, (*see* Dkt. No. 10), and Defendants filed an Answer to the Amended Complaint and, additionally, a Counterclaim against Plaintiff, on May 26, 2016, (*see* Dkt. No. 11). Plaintiff filed an Answer to Defendants' Counterclaim on June 20, 2016. (*See* Dkt. No. 12.) On August 17, 2016, Plaintiff filed a motion for conditional certification of a collective action pursuant to 29 U.S.C. § 216(b); authorization to send Court-approved notice to potential opt-in plaintiffs; and an order compelling Defendants to produce the names and addresses of such individuals. (*See* Dkt. Nos. 15–16.) On September 15, 2016, Defendants filed their opposition to Plaintiff's conditional certification motion, (*see* Dkt. No. 22), and on September 29, 2016, Plaintiff filed her reply, (*see* Dkt. No. 23). On February 8, 2017, the Court issued an Opinion & Order granting Plaintiff's conditional certification motion. (*See* Dkt. No. 33.)

On November 1, 2016, Plaintiff filed the instant Motion To Dismiss Defendants' Counterclaim and supporting papers. (*See* Dkt. Nos. 27–29.) Defendants filed an opposition to Plaintiff's Motion To Dismiss on November 14, 2016, (*see* Dkt. No. 30), and on the same day

---

[5] Defendants allege that "[f]rom September 3, 2014 forward and to the last date of Ms. Goncalez being its client, Affiliated was providing Ms. Goncalez, and billing Fidelis Care [at a rate of $18.55 per hour], for 168 hours per week of . . . services . . . ." (Counterclaim ¶¶ 113, 120.)

5

filed an amended opposition, (*see* Dkt. No. 31). Plaintiff filed a reply to Defendants' opposition to the Motion To Dismiss on December 2, 2016. (*See* Dkt. No. 32.)[6]

## II. Discussion

### A. Standard of Review

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988). "[T]he standards for dismissal pursuant to Rule 12(c) are the same as for a dismissal pursuant to Rule 12(b)(6) . . . ." *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 324 (2d Cir. 2011). To survive a motion to dismiss under Rule 12(c), therefore, "a complaint must allege sufficient facts which, taken as true, state a plausible claim for relief." *Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 68 (2d Cir. 2014). In reviewing a pleading, the Court "accept[s] all factual allegations as true and draw[s] every reasonable inference from those facts in the [non-movant's] favor." *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014) (internal quotation marks omitted). Moreover, along with the pleading itself, the Court "may consider . . . any written instrument attached to the [pleading] as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the [pleading] heavily relies." *ASARCO LLC v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014) (internal quotation marks omitted).

---

[6] While the Court was prepared to hear oral argument on the instant Motion at the conference on July 5, 2017, (*see* Dkt. No. 57 ("At [the July 5, 2017] conference, the Court will address the matters discussed herein and the pending [M]otion.")), Plaintiff's counsel was not prepared to argue the Motion.

The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss," and by extension, a Rule 12(c) motion for judgment on the pleadings, "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (second alteration in original) (citation omitted). Instead, the Supreme Court has emphasized that the "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.*, and that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563. A party must allege "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. But if a party has "not nudged [his] claims across the line from conceivable to plausible, the[] complaint must be dismissed." *Id.*; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))).

B. Analysis

"New York courts adhere to a strict approach to enforcement of restrictive covenants because their enforcement conflicts with the general public policy favoring robust and uninhibited competition, and powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood." *Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 214

(S.D.N.Y. 2013) (internal quotation marks omitted); *see also Nostrum Pharms., LLC v. Dixit*, No. 13-CV-8718, 2016 WL 5806781, at *15 (S.D.N.Y. Sept. 23, 2016) ("Restrictive covenants are disfavored because of the 'powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood' as well as the 'general public policy favoring robust and uninhibited competition.'" (quoting *Ashland Mgmt. Inc. v. Altair Investments NA, LLC*, 869 N.Y.S.2d 465, 471 (App. Div. 2008))). "It is well established under New York law that restrictive covenants in employment agreements are enforceable only to the extent that they satisfy the overriding requirement of reasonableness." *Payment Alliance Int'l Inc. v. Ferreira*, 530 F. Supp. 2d 477, 484 (S.D.N.Y. 2007) (internal quotation marks omitted)). Thus, "[r]estrictive covenants are unenforceable under New York law unless reasonable in scope, duration, and geographic area." *Nostrum Pharms.*, 2016 WL 5806781, at *15. More particularly, "an employee agreement not to compete will be enforced only if it is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee." *Poller*, 974 F. Supp. 2d at 214 (alteration and internal quotation marks omitted). The Court considers each of these factors in turn.

1. Scope

In relevant part, the restrictive covenant provides that "[a]s a condition of [her] employment with Affiliated," Plaintiff "agree[s] not to accept employment, either directly or indirectly, from any client of [Affiliated] to whom [she had] been assigned, for at least 90 days after the last day of [her] assignment." (*See* Aff. of Barbara Kessman Ex. A ("Contract") (Dkt. No. 31).) Plaintiff contends that "[t]he non-compete clause is void of a geographic scope limitation," rendering the clause unenforceable as a matter of law. (Mem. of Law in Supp. of

Mot. To Dismiss Counterclaim ("Pl.'s Mem.") 6 (Dkt. No. 29).) In response, Defendants contend that "the scope of this agreement could only cover Westchester, Putnam[,] and Dutchess counties, as Affiliated solely does business in those counties." (Opp'n to Mot. To Dismiss ("Defs.' Opp'n") 9 (Dkt. No. 31); *see also* Counterclaim ¶ 104 ("Affiliated is licensed, and does business exclusively, in the Counties of Dutchess, Putnam[,] and Westchester, within the State of New York.").)

The Court agrees with Plaintiff that, by its plain terms, the covenant contains no limit to its geographic scope. Although Defendants contend that the Court could infer a geographical limit reflecting only those counties in which Affiliated does business, (*see* Defs.' Opp'n 9), "[s]uch an argument would render reasonable-geographic-area requirements superfluous," *Prezio Health Inc. v. Schenk*, No. 13-CV-1463, 2016 WL 1367726, at *4 (D. Conn. Apr. 6, 2016). And while "[t]he Court will not strain itself in an effort to find the absence of a geographical area limitation to be a reasonable geographical area limitation," it should "earnestly analyze the reasonableness of geographical area restrictions within non-compete agreements." *Id.*; *see also Singas Famous Pizza Brands Corp. v. N.Y. Advert. LLC*, 468 F. App'x 43, 44 (2d Cir. 2012) (finding under New York law that restrictive covenants are "rigorously examined" in terms of scope).

Here, while the geographic scope is unlimited, the covenant only applies to "client[s] of [Affiliated] to whom [Plaintiff had] been assigned." (Contract.) Because the covenant applies only to clients *actually assigned* to Plaintiff, the otherwise unbounded nature of the restriction is mitigated. *See Ikon Office Sols., Inc. v. Usherwood Office Tech., Inc.*, No. 9202/08, 2008 WL 5206291, at *10 (N.Y. Sup. Ct. Dec. 12, 2008) ("[W]ith the term 'prospective customer' properly construed as limited to accounts actually assigned to particular individual [employees],

9

there is no serious claim that the geographic scope of the covenants are unreasonable."); *see also Malcolm Pirnie, Inc. v. Werthman*, 720 N.Y.S.2d 863, 863 (App. Div. 2001) (holding that despite a lack of geographical limitation, client-based restrictive covenants were enforceable).

In particular, courts "distinguish between covenants that prevent the employee from transacting business with a specified group of former customers and anticompetitive covenants that restrict the employee from engaging in the same business with all consumers of the service." *Prezio*, 2016 WL 1367726, at *4 (internal quotation marks omitted); *see also Greenwich Mills Co. v. Barrie House Coffee Co.*, 459 N.Y.S.2d 454, 457 (App. Div. 1983) (upholding non-compete clause and stating "much will depend on whether the covenant involves a total ban on competition with the former employer or, as here, the far lesser restriction of a ban on solicitation of its customers").

In a similar vein, courts outside New York have held that "a specific clause barring an employee from soliciting the employee's accounts that existed when the employee left . . . adequately fixed a geographic area limitation." *Prezio*, 2016 WL 1367726, at *4 (citing *Drummond Am. LLC v. Share Corp.*, No. 08-CV-1665, 2009 WL 3838800, *4 (D. Conn. Nov. 12, 2009) (finding that the employee was not prevented from pursuing her occupation because "the covenant only prevent[ed] [the employee] from doing business with the 26 customers with whom she did business during her last year of her employment with [employer]"); *Robert S. Weiss & Assocs., Inc. v. Wiederlight*, 208 Conn. 525, 531 (Conn. 1988) ("[T]he clause fixed the geographical scope of the covenant to a definite and limited area."). The Court agrees with this approach. Accordingly, the Court declines to find the lack of geographic scope alone renders the clause unenforceable.

2. Burden to Alves

Plaintiff additionally asserts that the limitation contained in the restrictive covenant "is overbroad and unreasonably burdensome," because the covenant "prevents [Plaintiff] from serving any and all clients she was assigned during her employment, regardless of when the client relationship was terminated or the length of time she worked with the client . . . . even if she provided service to the individual ten years ago for a single hour." (Pl.'s Mem. 7.)

"It is well established that restrictive covenants contained in employment contracts that tend to prevent an employee from pursuing a similar vocation after termination of employment are disfavored in the law." *Skaggs-Walsh, Inc. v. Chmiel*, 638 N.Y.S.2d 698, 699 (App. Div. 1996). However, Plaintiff was not prevented from continuing employment or seeking work as a home healthcare aide entirely during the 90 days, but rather was precluded only from working for *her* former clients of Affiliated. Moreover, courts have held that the 90-day limitation period is not particularly burdensome. *See Natsource LLC v. Paribello*, 151 F. Supp. 2d 465, 471 (S.D.N.Y. 2001) (finding a 90-day restriction to be "very limited in time"); *id.* ("[T]he period of time for which [the employee] will be unable to conduct these activities for a competitor is very short."); *see also A.N. Deringer, Inc. v. Strough*, 103 F.3d 243, 248 (2d Cir. 1996) (finding "there [was] no real dispute as to a reasonable time restriction" because "[t]he [90]-day [employment restriction] period was quite short"). Indeed, after the restriction period expired, there was no limitation whatsoever on the terms of Plaintiff's employment; Plaintiff could have even resumed working with Ms. Goncalez at that time. Because the covenant did not thwart Plaintiff's ability to earn a living during this time, the Court finds that there was no unreasonable burden imposed.

### 3. Impact on General Public

Plaintiff raises the important point that "[a]n individual's right to choose a health[]care provider is undoubtedly an issue that affects the general public." (Pl.'s Mem. 7.) Plaintiff's briefing suggests that she developed a strong bond to Ms. Goncalez and that maintaining Ms. Goncalez as a client was at least part of the reason Plaintiff decided to leave Affiliated and seek work with COI.

The type of restrictive covenant at issue here not only limits employment choices for individuals like Plaintiff, but negatively limits choices of a particularly vulnerable population—individuals in need of home healthcare. The Court finds that this factor weighs in favor of the unenforceability of the covenant.

### 4. Defendants' Legitimate Interests

Even where a court deems a restrictive covenant reasonable, "it must still fall into one of two categories in order to be enforced." *Paribello*, 151 F. Supp. 2d at 470. "For an employer to prevail, the covenant must be necessary to either (1) prevent an ex-employee from disclosing trade secrets or confidential information to the employer's competitors, or (2) . . . stop an employee with special, unique, or extraordinary skills from working for a competitor at a detriment to the initial employer." *Id.* "An employer's 'legitimate interests' include (1) the protection of trade secrets; (2) where the employer is exposed to "special harm" due to the "unique" nature of an employee's services; and (3) the goodwill of an employer's business." *Nostrum Pharms.*, 2016 WL 5806781, at *11.

Defendants do not contend that they are attempting to protect trade secrets or other confidential information, and any information that Plaintiff may have retained about Ms. Goncalez and the care she preferred is not confidential. *See Pure Power Boot Camp, Inc. v.*

*Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 510 (S.D.N.Y. 2011) ("[F]ormer employees can use their recollection of information about customers, and such recollected information is not considered confidential for purposes of enforcing restrictive employment covenants."). Plaintiff did not offer the type of "unique" skills or services that expose Affiliated to "special harm," *Nostrum Pharms.*, 2016 WL 5806781, at *11, and Defendants do not contend otherwise, *see Concord Limousine, Inc. v. Orezzoli*, No. 19347/03, 2005 WL 1224972, at *8 (N.Y. Sup. Ct. May 20, 2005) ("In order to demonstrate that a former employee performed unique or extraordinary services for [the employer], the [employer] must show that the employee was irreplaceable and that the employee's departure caused some special harm to [the employer]."). Indeed, Defendants' assertion that Plaintiff "literally could work for one of the many tens of thousands of individuals or many dozens of agencies just in the Westchester-Putnam-Dutchess county area," suggests that there are "tens of thousands" of employees that could potentially fill these positions and that the skills required are not irreplaceable. (Defs.' Opp'n 14.)

Defendants nonetheless allege that "actual and prospective loss of 'goodwill' . . . to Affiliated . . . occurred here," because "Plaintiff left the employment of Affiliated and the client left with her." (*Id.* at 15; *see also id.* at 11 ("[P]laintiff immediately (if not earlier) commenced working for Affiliated's former client . . . .").) The allegations in Defendants' Counterclaim appear to contradict the contention that Ms. Goncalez followed Plaintiff to COI and not vice versa. (*See* Counterclaim ¶ 119 ("Ms. Goncalez left the care of Affiliated on or about November 4, 2015, to become a client of COI."); *id.* ¶ 122 ("On or about December 4, [2015,] [P]laintiff contacted [D]efendants by telephone to inform [them] she was going to 'take a break' from her [e]mployment and would not be working for a while.").) However, Defendants' additional

13

allegations that between November 4 and December 4, 2015—prior to leaving her employment with Affiliated—Plaintiff's truck was seen at Ms. Goncalez' residence, (*see id.* ¶ 121), plausibly suggests that Plaintiff may have started employment with COI before ending her tenure with Affiliated, (*see id.* ¶ 125 ("Upon information and belief, on or about December 5, 2015 (if not in the weeks immediately prior thereto), [P]laintiff began employment with COI.")).

"Protection of customer relationships the employee acquired in the course of employment may indeed be a legitimate interest." *BDO Seidman v. Hirshberg*, 712 N.E.2d 1220, 1224 (N.Y. 1999) (emphasis omitted); *see also id.* ("The employer [also] has a legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which had been created or maintained at the employer's expense, to the employer's competitive detriment."). The Court thus finds that the inclusion of the restrictive covenant was reasonable to protect the goodwill of Defendants' business. *See Nostrum Pharms.*, 2016 WL 5806781, at *11 ("An employer's 'legitimate interests' include . . . the goodwill of an employer's business."). Accordingly, taking Defendants' allegations as true, it is plausible that the restrictive covenant was not unreasonable and the Court declines to find it unenforceable at this time.

### III. Conclusion

For the foregoing reasons, Plaintiff's Motion To Dismiss Defendants' Counterclaim is denied without prejudice. The Clerk of Court is respectfully requested to terminate the pending Motion. (*See* Dkt. No. 27.)

SO ORDERED.

Dated: September 26, 2017
White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE