UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARIA ALVES, *et al.*, *on behalf of all others similarly situated*,

                                    Plaintiffs,

        v.

AFFILIATED CARE OF PUTNAM, INC., *et al*,

                                    Defendants.

---

No. 16-CV-1593 (KMK)

OPINION & ORDER

Appearances:

Nathaniel K. Charny, Esq.
H. Joseph Cronen, Esq.
Russell Gustavson Wheeler, Esq.
Charny & Wheeler PC
Rhinebeck, NY
*Counsel for Plaintiffs*

Daniel C. Stafford, Esq.
McCabe & Mack LLP
Poughkeepsie, NY
*Counsel for Plaintiffs*

Steven Felsenfeld, Esq.
Felsenfeld Legal, PLLC
Ossining, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Maria Alves ("Alves"), Dirce Freires ("Freires"), Louise Henry ("Henry"), Camile Jones

("Jones"), Anna Maria Silva ("Silva"),  Paula Simmonds ("Simmonds"), Leny Smith ("Smith"

and collectively, "Plaintiffs") bring this Action on behalf of themselves and others similarly

situated against Affiliated Home Care of Putnam, Inc. ("Affiliated") and Barbara Kessman

("Kessman" and collectively, "Defendants"), seeking to recover overtime compensation and other damages pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., and Article 6 of the New York State Labor Law ("NYLL") and its corresponding regulations. (Second Am. Compl. ("SAC") ¶¶ 1–8 (Dkt. No. 262).)[1]  Plaintiffs bring (1) a Motion for Class Certification and Final Certification of the Collective Action, ((Dkt. No. 287), and (2) a Motion for Summary Judgment, (*see* Not. of Mot. (Dkt. No. 289); Defendants bring their own Motion for Summary Judgment, (Dkt. No. 296).

For the reasons set forth below, Plaintiffs' Motion for Class Certification and Final Certification of the Collective Action is granted in full, Plaintiffs' Motion for Summary Judgment is granted in part and denied in part, and Defendants' Motion for Summary Judgment is denied in full.

## I.  Background

### A.  Factual Background

The following facts are taken from the Plaintiffs' Statement Pursuant to Local Rule 56.1, (Pls.' Rule 56.1 Statement in Supp. of Mot. ("Pls.' 56.1") (Dkt. No. 291)), Defendants' Statement Pursuant to Local Rule 56.1, (Defs.' Rule 56.1 Statement in Opp'n to Mot. ("Defs.' 56.1") (Dkt. No. 302)), Pls.' Counter Statement Pursuant to Civil Rule 56.1, (Pls.' Counter Statement in Supp. of Mot. ("Pls.' Counter 56.1") (Dkt. No. 316)), and other documents.[2]

---

[1] On October 21, 2020, the following Plaintiffs were terminated from the case: Kelly Barrett, Diana Batsa, Aline Dhaiti, Linotte Dhaiti, Janice Edwards, Thamia Fajardo, Fiona Hart, Theresa Jackson, Bridgette Jones, Kathleen Kazimir, Goerganna MacLeod, Carmel Mercadante, Joan Mullen, Tatiana Pietris, Duglas A. Ramos Perez, Carla Rankel, Maria Rebelo, Hortense Reid-Stone, Lorna Ricketts, Alvamanda Rojas, Diandra Roman-Whyte, Patricia Ryan, Jasmin Taylor, and Kathryn Williams.  (*See* Dkt. (entry for Oct. 21, 2020).)

[2] Given that the Parties' 56.1 Statements are sparse, the Court has been forced to rely upon the record and the Court's prior opinions to establish the factual predicate underlying this

1. The Parties

During the relevant time period, Plaintiffs were engaged as personal care aids ("PCAs")

and consumer directed personal assistants ("CDPAs") by Affiliated, the principal shareholder

and executive officer of which is Kessman.  (Pls.' 56.1 ¶¶ 1, 2.)[3]  In particular, Alves was

employed by Affiliated from October 7, 2006, through December 4, 2015.  (Pls.' 56.1 ¶ 9.)

Alves' responsibilities included "bathing and grooming patients," services Alves asserts are

"typically provided by home health aides." (Feb. 2017 Op. & Order ("Feb. 2017 Op.") 2 (Dkt.

No. 33) (citing Am. Compl. ¶ 20 (Dkt. No. 10)).)  Alves avers that at the direction of Defendants,

she also performed tasks "outside the scope of her employment," (*id.* (citing Am. Compl. ¶ 21)),

such as "removing garbage, dusting, cleaning refrigerators, cleaning ovens, cleaning common

areas and areas of homes not ordinarily used by patients, shoveling snow, ironing the patients'

clothes and sheets, ironing clothes belonging to other members of the household, washing

windows and curtains, transporting firewood into homes, and caring for plants and gardens," (*id.*

(citing Am. Compl. ¶ 20)).  Alves alleges that "[d]espite regularly working in excess of 40 hours

per week," Defendants never provided her overtime pay.  (*Id.* at 3 (quoting Am. Compl. ¶ 24).)

Alves further alleges that she "became aware through observations and conversations that other

employees of Defendants performed the same or similar tasks" as Alves and that Alves

"observed these employees frequently working over 40 hours per week and not being paid

overtime wages."  (*Id.* (quoting Decl. of Maria Alves ("Alves Decl.") ¶ 6 (Dkt. No. 15-1)).)

---

Action.  Thus, direct citations to the record and the Court's prior opinions have been used where
relevant facts were not included in the Parties' 56.1 Statements.

[3] The Parties dispute the extent to which Kessman is involved in the day-to-day
operations of Affiliated.  Plaintiffs claim that Kessman "regularly exercises the day-to-day
operational control of" Affiliated.  (Pls.' 56.1 ¶ 3.)  Defendants claim that Kessman "was
involved in the day-to-day operations of Affiliated sometimes as she only worked
part-time . . . due to medical reasons . . . ."  (Defs.' 56.1 ¶ 3 (quotation marks omitted).)

<u>2. The Home Care Final Rule</u>

The following legal background is taken from the Court's February 7, 2017 Opinion & Order, (*see* Feb. 2017 Op. at 6–7):

Prior to 2015, the FLSA exempted domestic service employees from minimum wage and maximum hour requirements.  *See* 29 U.S.C. § 213(a)(15) ("[Minimum wage and maximum hour provisions of] this title shall not apply with respect to . . . any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves . . . .").  However, the performance of general household work of the type Plaintiffs contend they performed is not exempt from overtime payment if such work exceeded 20 percent of the total weekly hours worked.  *See* 29 C.F.R. § 552.6 ("The term companionship services also includes the provision of care if the care is provided attendant to and in conjunction with the provision of fellowship and protection and *if it does not exceed 20 percent of the total hours worked per person and per workweek*." (emphasis added)).

On October 1, 2013, the Department of Labor ("DOL") issued the "Home Care Final Rule," *see* Application of the Fair Labor Standards Act to Domestic Service, 78 Fed. Reg. 60,454 (Oct. 1, 2013) (codified at 29 C.F.R. 552), effecting changes to the DOL's regulations regarding domestic services employment.  Among other changes, the new rule precluded third-party employers—such as Defendants—from claiming the exemption under the FLSA's overtime provisions for companionship services or live-in domestic service employees.  *See* 29 C.F.R. § 552.109(a) ("Third party employers of employees engaged in companionship services within the meaning of § 552.6 may not avail themselves of the minimum wage and overtime exemption . . . .").  The Rule was intended to go into effect on January 1, 2015, *see* 78 Fed. Reg. at 60,494,

4

however, in June 2014, associations of home care companies filed an action challenging the new

rule, *see Home Care Ass'n of Am. v. Weil*, 76 F. Supp. 3d 138 (D.D.C. 2014).  In December 2014

and January 2015, the United States District Court for the District of Columbia issued opinions

and orders vacating the rule's revised third-party regulation and revised definition of

companionship services, respectively.  *See id*. at 148 ("[T]he United States Department of

Labor's Third Party Employer regulation, promulgated in 78 Fed. Reg. 60,557 and to be codified

at 29 C.F.R. § 552.109, is hereby VACATED."); *Home Care Ass'n of Am. v. Weil*, 78 F. Supp.

3d 123, 130 (D.D.C. 2015) ("[T]he United States Department of Labor's regulation defining

'companionship services,' promulgated in 78 Fed. Reg. 60,557 and to be codified at 29 C.F.R. §

552.6, is hereby VACATED.").  The DOL appealed, and on October 13, 2015, the Court of

Appeals for the District of Columbia Circuit issued a unanimous opinion affirming the validity of

the Home Care Final Rule and reversing the orders of the district court.  *Home Care Ass'n of Am.

v. Weil*, 799 F.3d 1084, 1097 (D.C. Cir. 2015), *cert. denied*, 136 S. Ct. 2506 (2016).  On October

27, 2015, the DOL said that it would not begin enforcing the final rule until November 12, 2015.

*See* Application of the Fair Labor Standards Act to Domestic Service; Dates of Previously

Announced 30-Day Period of Non-Enforcement, 80 Fed. Reg. 65,646 (codified at 29 C.F.R. §

552).

### 3. Overtime Payments

Plaintiffs in this Action fall under two categories: (1) PCAs who were paid as W-2

employees, and (2) CDPAs who were paid as 1099 independent contractors.[4]  (*See* Pls.' Mem. in

Supp. of Mot. for Summ. J. ("Pls.' MSJ Mem.") 4 (Dkt. No. 290) (citing Pls.' 56.1 ¶¶ 11–13,

20); *see also* Defs.' 56.1 ¶ 10.)  Although Defendants concede that they are obligated to pay

---

[4] "W-2" and "1099" refer to the relevant tax documents.

overtime to the W-2 PCAs, Defendants dispute that they are obligated to pay overtime to the 1099 CDPAs.  (*See* Defs.' 56.1 ¶ 11.)

The Parties do not dispute that in March 2016, upon advice of counsel, Affiliated paid all PCAs their owed overtime from October 13, 2015 forward.  (*Id.* ¶ 13.)  However, the Parties dispute whether overtime is owed from the period from January 1, 2015 to October 13, 2015. (*See* Pls.' Counter 56.1, Part II ¶ 20.)[5]  Additionally, the Parties do not dispute that PCAs must be certified, whereas CDPAs do not require any certification.  (*Id.*, Part II ¶¶ 2–3.)  The Parties disagree, however, on whether the CDPAs should be categorized as independent contractors, and thus whether the CDPAs are entitled to overtime.  (*See id.*, Part II ¶¶ 4, 5, 8–10, 12, 13–18.)

### 4. Causes of Action

The SAC asserts three claims: (1) failure to pay overtime in violation of the FLSA, (SAC ¶¶ 51–54), (2) failure to pay overtime in violation of the NYLL, (*id.* ¶¶ 55–57), and (3) failure to provide wage notices and statements in violation of the NYLL, (*id.* ¶¶ 58–61).  Plaintiffs seek liquidated damages as provided for by the FLSA and the NYLL, pre- and post-judgment interest, and any further relief available under the FLSA and the NYLL and its corresponding regulations. (*Id.*, Request for Relief ¶¶ (d)–(e)).[6]  Plaintiffs also request attorney's fees and costs.  (*Id.*, Request for Relief ¶¶ (g)–(h)).

---

[5] Starting on page 10 of Plaintiffs' Counter 56.1 Statement, there is a section labeled "II. Undisputed Contra Facts in Opposition and/or Facts in Support of Defendants' Summary Judgment Motion."  For ease of reference, the Court will refer to this section as "Part II."

[6] Beginning on page 11 of the SAC there is a section labeled "Request for Relief."  The Court will refer to it as such.

B.  Procedural History[7]

Alves filed her original Complaint on March 2, 2016, (Dkt. No. 1), and Defendants filed

an Answer on May 2, 2016, (Dkt. No. 9).  Alves filed an Amended Complaint on May 12, 2016.

(Dkt. No. 10).  Defendants filed both an Answer to the Amended Complaint and a Counterclaim

against Alves on May 26, 2016.  (Dkt. No. 11.)  Alves filed an Answer to Defendants'

Counterclaim on June 20, 2016.  (Dkt. No. 12.)

On August 17, 2016, Alves filed a  Motion to Proceed as a Collective Action. (Dkt. Nos.

15, 16.)  On September 15, 2016, Defendants filed their Opposition to Alves' Motion, (Dkt. No.

22), and on September 29, 2016, Alves filed her Reply, (Dkt. No. 23).  On February 7, 2017, the

Court granted Alves' Motion to Proceed as a Collection Action.  (Dkt. No. 33.)

On February 22, 2017, Alves filed a Motion for Reconsideration regarding the Court's

determination in its February 17, 2017 Opinion & Order concerning the effective date of the

"Home Care Rule."  (Dkt Nos. 38, 39.)  Defendants filed an Opposition to Alves' Motion for

Reconsideration on March 7, 2017.  (Dkt. No. 43.)  On May 15, 2017, the Court denied the

Motion for Reconsideration as premature.  (Dkt. No. 50.)

On November 1, 2016, Alves filed a Motion To Dismiss Defendants' Counterclaim and

supporting papers.  (Dkt. Nos. 27–29.)  Defendants filed an Opposition to Alves' Motion To

Dismiss on November 14, 2016, (Dkt. No. 30), and on the same day filed an Amended

Opposition, (Dkt. No. 31).  Alves filed a Reply to Defendants' opposition to the Motion To

---

[7] The Court recounts this Action's procedural history in chronological order for the most part, but at times, the Court recounts the procedural history out of chronological order for the sake of clarity.

Dismiss on December 2, 2016.  (Dkt. No. 32.)  The Court denied the Motion on September 28, 2017.  (Dkt. No. 72.)

On April 12, 2017, Kathleen Kazimir and Ana Maria Silva filed Consents to Become Party Plaintiffs.  (Dkt. Nos. 45, 46.)  On May 4, Dirce Freires and Linotte Dhaiti filed Consents to Become Party Plaintiffs.  (Dkt. Nos. 48, 49.)  On May 25, 2017, Goerganna MacLeod filed a Consent to Become a Party Plaintiff.  (Dkt. No. 51.)  On June 9, 2017, Maria Rebelo filed a Consent to Become a Party Plaintiff.  (Dkt. No. 54.)  On March 13, 2020, Duglas Ramos Perez filed a Consent to Become a Party Plaintiff.  (Dkt. No. 169.)  On March 18, 2020, Camile Jones, Diandra Roman-Whyte, Jasmin Taylor, Patricia Ryan, and Thamia Fajardo filed Consents to Become Party Plaintiffs.  (Dkt. Nos. 170–174.)  On March 23, 2020, Carla Rankel, Joan Mullen, and Kathryn Williams filed Consents to Become Party Plaintiffs.  (Dkt. Nos. 175–177.)  On April 1, 2020, Janice Edwards filed a Consent to Become a Party Plaintiff.  (Dkt. No. 178.)  On April 5, 2020, Alvamanda Rojas filed a Consent to Become a Party Plaintiff.  (Dkt. No. 179.)  On April 8, 2020, Paula Simmonds filed a Consent to Become a Party Plaintiff.  (Dkt. No. 181.)

On June 21, 2021, Plaintiffs filed the Motion for Class Certification and Final Certification of the Collective Action and an accompanying memorandum of law.  (Dkt. Nos. 287–288.)  On the same day, Plaintiffs also filed a Motion for Summary Judgment and supporting papers.  (Dkt. Nos. 289 –292.)  On August 15, 2021, Defendants filed their own Motion for Summary Judgment, an Opposition to Plaintiffs' Motions, and supporting papers. (Dkt. Nos. 296–302, 305–307.)   On September 24, 2021, Plaintiffs filed Replies to their Motions, an Opposition to Defendants' Motion, and supporting papers.  (Dkt. Nos. 312–317.) On October 16, 2021, Defendants filed their Reply and accompanying papers.  (Dkt. Nos. 321 – 323.)  On October 17, 2021, Defendants filed an Amended Reply.  (Dkt. No. 325.)

II.  Discussion

A.  Summary Judgment

1. Applicable Law

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cnty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same); *Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts

showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires

a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ."); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (internal quotation marks omitted)).

As a general rule, "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage." *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (noting that at the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter"); *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (citation omitted)).  Where the evidence presents "a question of 'he said, she said,'" the court "cannot . . . take a side at the summary judgment stage." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010); *see also Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 535 (S.D.N.Y. 2017) (noting that "it is not the role of the [c]ourt at summary judgment to resolve [a] factual clash"); *Bale v. Nastasi*, 982 F. Supp. 2d 250, 258–59 (S.D.N.Y. 2013) (stating that "[w]here each side ... tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court").  And, even if the non-movant's evidence is "thin, [a non-movant's] own sworn statement is adequate to counter summary judgment." *Scott v. Coughlin*, 344 F.3d 282, 290–91 (2d Cir. 2003) (holding that "[t]he

credibility of [the plaintiff's] statements and the weight of contradictory evidence may only be evaluated by a finder of fact").

 2. Application

  a. Expert Testimony

 As an initial matter, the Court will address Defendants' putative motion to disqualify Plaintiffs' proffered expert witness.  (*See generally* Defs.' Mem. of Law in Supp. of Mot. to Disqualify Pls.' Expert Witness ("Defs.' *Daubert* Mem.") (Dkt. No. 298).)   In support of their Motion for Summary Judgment, Plaintiffs provide the expert testimony of Aaron Freed ("Freed").  (*See* Decl. of Nathaniel K. Charney, Esq. ("Charney Decl.") ¶ 7 (Dkt. No. 292).) Freed is a data processing expert who "provid[es] data analysis business intelligence and strategy development services on a freelance basis."  (Charney Decl. Ex. 4-9 ("Freed CV") (Dkt. No. 292-4).)  Plaintiffs retained Freed to analyze and process "all of the payroll records for all home care staff that worked for Defendants for the period January 8, 2015 through June 11, 2020 ([] the "ADP Data")."  (Charney Decl. ¶ 5.)  Defendants argue that Freed lacks the experience to qualify as an expert witness and that the methodology he used is faulty.  (*See generally* Defs.' Dabuert Mem.)

 At the summary judgment stage, a court can "decide questions regarding the admissibility of evidence, including expert opinion evidence[.]"  *Gjini v. United States*, No. 16-CV-3707, 2019 WL 498350, at *13 (S.D.N.Y. Feb. 8, 2019) (alteration in original) (quoting *Bah v. Nordson Corp*., No. 00-CV-9060, 2005 WL 1813023, *6 (S.D.N.Y. Aug. 1, 2005)).  "If a proffer of expert testimony is excluded as inadmissible pursuant to [Federal Rule of Evidence] 702, the court must make the summary judgment determination on a record that does not include that evidence."  *Colon ex rel. Molina v. BIC USA, Inc*., 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001).

Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Although it is the role of the jury to determine the credibility of an expert witness, it is the role of the trial court to serve as a "gatekeep[er]" to ensure that the expert testimony is reliable and relevant before it is presented to the jury. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (finding that the trial judge's gatekeeping obligation applies to all expert testimony); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993) (holding that the district court must ensure that a witness is qualified as an expert and "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand").

"[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *I.M. v. United States*, 362 F. Supp. 3d 161, 191 (S.D.N.Y. 2019) (alteration in original) (quoting *United States v. Williams,* 506 F.3d 151, 160 (2d Cir. 2007)); *see also LVL XII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 635 (S.D.N.Y. 2016) (same). "[T]he trial judge has broad discretion in the matter of the admission or exclusion of expert evidence." *Salem v. United States Lines Co.*, 370 U.S. 31, 35 (1962); *see also Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC,* 571 F.3d 206, 213 (2d Cir. 2009) ("The decision to admit expert testimony is left to the broad discretion of the trial judge and will be overturned only when manifestly erroneous.").

The Court must first address "the threshold question of whether a witness is qualified as an expert by knowledge, skill, experience, training, or education to render his or her opinions." *Nimely v. City of New York*, 414 F.3d 381, 396 n.11 (2d Cir. 2005) (quotation marks omitted).  In doing this, the Court asks "whether the proffered expert has the educational background or training in a relevant field . . . by looking at the totality of the witness's background." *Arista Records LLC v. Lime Grp. LLC*, No. 06-CV-5936, 2011 WL 1674796, at *2 (S.D.N.Y. May 2, 2011) (citations and internal quotation marks omitted).  Then, the Court must "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony" to "ensure that the expert will actually be testifying on issues or subject matters within his or her area of expertise." *Id.* (alteration, citations, and internal quotation marks omitted).  Courts in the Second Circuit liberally construe the expert qualifications requirement, and generally will not exclude expert testimony provided "the expert has educational and experiential qualifications in a general field closely related to the subject matter in question." *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007); *see also In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 559 (S.D.N.Y. 2004) ("The Second Circuit has taken a liberal view of the qualification requirements of Rule 702, at least to the extent that a lack of formal training does not necessarily disqualify an expert from testifying if he or she has equivalent relevant practical experience.").

Here, Freed has a Bachelor's degree in Operations Research from the United States Air Force Academy, a Master's degree in Operations Research from Stanford University, a Master's degree in Organizational Management from George Washington University, and a Master's Degree in Governmental Analytics from John's Hopkin's University.  (*See* Freed CV.)  Freed has "worked with data across a variety of industries, including medical, software, oil, aerospace,

e-commerce, technology, manufacturing, real estate, government, network infrastructure, and personnel." (*See id*.) In sum, Freed has 29 years of experience in the field of data analysis, and four degrees to back up that experience—three of which are graduate-level degrees. Looking at the totality of Freed's background, the Court concludes that he has the educational credentials, experience, and training to qualify as a data processing expert in this case.

It must also be said that an expert "need not be a specialist in the exact area [] implicated by the plaintiff[s'] injury, [but] he must have relevant experience and qualifications such that whatever opinion he will ultimately express would not be speculative." *Loyd v. United States*, No. 08-CV-9016, 2011 WL 1327043, at *5 (S.D.N.Y. Mar. 31, 2011) (internal citations and quotations omitted). Indeed, "[d]eference to experts is particularly appropriate when expert testimony concerns 'soft sciences' like economics." *In re Air Cargo Shipping Servs. Antitrust Litig*., No. 06-MD-1175, 2014 WL 7882100, at *8 (E.D.N.Y. Oct. 15, 2014), *report and recommendation adopted*, 2015 WL 5093503 (E.D.N.Y. July 10, 2015). To be sure, there are some gaps in Freed's qualifications, especially given that he has never before served as an expert witness, nor does it appear that he has extensive experience analyzing payroll data in particular. However, as Plaintiffs point out, this factor alone does not preclude them from giving expert testimony. (*See* Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Disqualify Pls.' Expert Witness ("Pls' *Daubert* Opp'n") 4 (Dkt. No. 313) (citing *CDR-Wantagh, Inc. v. Shell Oil Co*., 2011 WL 795865, at *5–8 (E.D.N.Y. Feb. 28, 2011) (allowing testimony and report of a first-time expert)).) Additionally, "Defendants may cross-examine [Freed] about the gaps in his credentials and argue that the fact finder should not give much or any weight to [Freed's] testimony. But it is not for the Court at this stage to assess [Freed] credibility or to decide how much weight his testimony should be given." *I.M.*, 362 F. Supp. 3d at 193 (citing *Jeffreys*, 426

F.3d at 551 (holding that "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage")).

Next, "[i]n determining whether an expert's opinion should be excluded as unreliable, 'the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand.'" *Houser v. Norfolk S. Ry. Co*., 264 F. Supp. 3d 470, 475 (W.D.N.Y. 2017) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp*., 303 F.3d 256, 267 (2d Cir. 2002)). Neither "*Daubert* or the Federal Rules of Evidence require[] a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Nimely*, 414 F.3d at 396 (alteration in original) (italics omitted) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). "Thus, when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266.

The Court concludes that there is enough in the record to reject the claim that Freed's testimony is unreliable. Defendants argue that Freed did not utilize reliable principles or methods in analyzing the ADP Data. (*See* Defs.' *Daubert* Mem. at 5–6; *see also* Defs.' Am. Reply. Mem. of Law in Supp. of Defs.' Mot. to Disqualify Pls.' Expert Witness (Defs.' Am. *Daubert* Reply) 3–7 (Dkt. No. 325). Defendants first argue that "irrespective of the anomalous result, such as someone working 910 hours during a 168 Earth week, it raised nary a hackle for Freed (as expert), who then simply lopped off the extra 742 hours to return to Earth; and did not for a moment question his [m]ethodology." (Defs.' *Daubert* Mem. at 5.) Plaintiffs counter that

Defendants "fail to point to any material flaws in Mr. Freed's analysis or methods. . . . Indeed, . . . Defendant[s'] repeatedly decry Mr. Freed for ostensibly adhering to a methodology that failed to account for absurd results, yet when Mr. Freed corrected for a facially impossible result, they criticized him for doing so."  (Pls.' *Daubert* Opp'n at 5–6.)  The Court agrees with Plaintiffs.

As Plaintiffs point out, "the supposed scope of Mr. Freed's errors is miniscule . . . yielded impossible results approximately 0.75% of the time. . . . Furthermore, he addressed all of the errors he identified by either excluding them or reducing the number of hours worked to what Defendants have dubbed an 'Earth week' (168 hours)."  (*Id.* at 6–7.)  The Court further notes that Freed extensively outlined his process and the reasoning behind his conclusions, including how he dealt with absurd results stemming from missing values in the ADP Data.  (*See* Charny Decl. Ex. 4 ("Freed Expert Report"), at 2–3 (Dkt. No. 294-4).)  *See also Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006) ("An expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion.").  Even if the methods that Freed employed to correct for absurd results were flawed, "[m]inor flaws in an expert's analysis [] can be probed through cross-examination and generally go to the weight to be accorded to the expert's testimony rather than admissibility."  *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 252 (S.D.N.Y. 2010).  To that end, "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible."  *Amorgianos,* 303 F.3d at 267 (italics omitted).  "The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions."  *Id.* (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 746 (3d Cir. 1994)); *see also Daubert*, 509 U.S. at 590.

Second, Defendants argue that Freed's reliance upon Plaintiffs' attorney "for his [m]ethodology, for his data and for his primer about New York's [CDPA] [p]rogram" is unfounded.  (Defs.' *Daubert* Mem. at 5.)  However, as Plaintiffs point out, (*see* Pls.' *Daubert* Opp'n at 8–9), the court in *Campbell v. City of New York* permitted expert testimony in similar factual circumstances.  *See* No. 16-CV-8719, 2021 WL 826899, at *3 (S.D.N.Y. Mar. 4, 2021). The court in *Campbell* explained:

> Reliance on th[e] [plaintiff's counsel's] assumption, however, does not render [the expert's] testimony unreliable nor does it usurp the jury's role of applying the law to facts.  [The expert witness] is not providing expert testimony as to the factual question of whether [the] [p]laintiffs were in fact working during these hours, but to the extent of the damages owed in the event that [the] [p]laintiffs prevail on that claim.

*Campbell*, 2021 WL 826899, at *3.  Additionally, "[a]lthough expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, . . . other contentions that the assumptions are unfounded go to the weight, not the admissibility of the testimony."  *CDR-Wantagh*, 2011 WL 795865, at *10 (quoting *BIC Corp. v. Far E. Source Corp.*, 2001 WL 1230706, at *1 (2d Cir. Oct. 12, 2001)); *see also Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1188 (2d Cir. 1992) (refusing to strike expert testimony allegedly based upon unfounded assumptions because challenges to expert testimony "go to the weight, not the admissibility, of the testimony").

Indeed, "[i]t is not for the Court at this stage to decide which . . . explanation of [the ADP Data] is more plausible."  *I.M.*, 362 F. Supp. 3d at 193.  "The fact that the defendants' experts would draw contrary inferences from the same data does not render either expert's testimony inadmissible, nor does it speak to the reliability of the methodology."  *U.S. Info. Sys., Inc. v. Int'l Broth. of Elec. Workers Local No. 3.*, 313 F. Supp. 2d 213, 229 (S.D.N.Y. 2004); *see also Scott v. Coughlin*, 344 F.3d 282, 290–91 (2d Cir. 2003) (holding that "[t]he credibility of [plaintiff's]

statements and the weight of contradictory evidence may only be evaluated by a finder of fact");

*Bale v. Nastasi*, 982 F. Supp. 2d 250, 258–59 (S.D.N.Y. 2013) ("[W]here each side . . . tells a

story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make

the credibility determinations and apportion liability, and not for the court.").

Because the Court concludes that Freed is qualified to testify and does not find his

testimony unreliable, Defendants' argument that Plaintiffs expert witness should be disqualified

fails.

### b. FLSA and NYLL Claims

#### i. Home Care Rule Effective Date

Plaintiffs first argue that they are entitled to summary judgment on the legal question of

when the Home Care Rule became effective.  Specifically, Plaintiffs argue that it became

effective on January 1, 2015, DOL's original effective date and not, as Defendants argue, on

October 13, 2015, the date on which the D.C. Circuit's mandate issued.  (*See* Pls.' Mem. of Law

in Supp. of Mot. for Summ. J. ("Pls.' MSJ Mem.") 1 (Dkt. No. 290).)

Although the Second Circuit has yet to opine on this question, as Plaintiff points out, (*see*

Pls.' MSJ Mem. 3–4), and Defendants concede, (*see* Defs.' Mem. of Law in Opp'n to Pls.' Mot.

for Summ. J. ("Defs.' MSJ Opp'n") 16 (Dkt. No. 300)), the district courts within the Second

Circuit that have addressed this issue have overwhelmingly found the effective date of the Home

Care Rule to be January 1, 2015.  *See, e.g.*, *Downie v. Carelink, Inc.*, No. 16-CV-5868, 2018 WL

3585282, at *4 (S.D.N.Y. July 26, 2018) ("The [c]ourt adopts the reasoning of . . . the other

cases in this circuit that have reached the same conclusion: The relevant regulations took effect

on January 1, 2015."); *Tagaeva v. BNV Home Care Agency, Inc.*, No. 16-CV-6869, 2018 WL

1320661, at *3 (E.D.N.Y. Mar. 13, 2018) ("[T]his [c]ourt agrees with the majority of courts to

have addressed the issue, and finds that the effective date of the DOL Regulation was January 1, 2015."); *Shillingford v. Astra Home Care, Inc*., 293 F. Supp. 3d 401, 409 (S.D.N.Y. 2018) ("[T]he [c]ourt adopts the reasoning of other courts in this Circuit to consider the issue and finds that this amendment took effect on January 1, 2015."); *Carrasco v. Life Care Servs., Inc*., No. 17-CV-5617, 2017 WL 6403521, at *5 (S.D.N.Y. Dec. 15, 2017) ("The [c]ourt joins the other courts in this circuit and the majority of other courts to consider the issue in finding that the DOL Regulation took effect on January 1, 2015."); *Green v. Humana at Home, Inc*., No. 16-CV-7586, 2017 WL 9916832, at *3 (S.D.N.Y. Sept. 29, 2017) ("[T]he regulation [] should be treated as effective beginning on the regulation's Congressionally prescribed effective date of January 1, 2015."); *Hypolite v. Health Care Servs. of New York Inc*., 256 F. Supp. 3d 485, 492 (S.D.N.Y. 2017) (agreeing with the "overwhelming majority of well-reasoned opinions [that] have concluded that the Home Health Aide Exemption was narrowed on January 1, 2015"); *Kinkead v. Humana, Inc*., 206 F. Supp. 3d 751, 752 (D. Conn. 2016) (concluding that "the rule took effect on the effective date set forth by the agency[, January 1, 2015]").

A number of district courts outside the Second Circuit have come to the same conclusion. *See, e.g.*, *Evans v. Caregivers, Inc*., No. 17-CV-0402, 2017 WL 2212977, at *4 (M.D. Tenn. May 19, 2017) ("This court is likewise persuaded by the reasoning in *Kinkead* and finds that the effective date of the new rule is January 1, 2015."); *Guerrero v. Moral Home Servs., Inc*., No. 16-CV-23051, 2017 WL 1155885, at *3 (S.D. Fla. Mar. 27, 2017) ("The [c]ourt agrees with the more recent well-reasoned opinions that conclude the effective date is January 1, 2015."); *Dillow v. Home Care Network, Inc*., No. 16-CV-612, 2017 WL 749196, at *5 (S.D. Ohio Feb. 27, 2017) ("[I]n this circumstance, it is clear that the retroactive effect of the D.C. Circuit Court's decision . . . requires this [c]ourt to find that the new overtime regulations for companionship services

were in effect as of January 1, 2015."); *Cummings v. Bost, Inc.*, 218 F. Supp. 3d 978, 987 (W.D. Ark. 2016) ("[t]he Court [] considers the Final Rule effective as of the date the DOL consistently maintained it would be—January 1, 2015"); *Lewis-Ramsey v. Evangelical Lutheran Good Samaritan Soc'y*, 215 F. Supp. 3d 805, 810 (S.D. Iowa 2016) ("After careful consideration of the parties' submissions, the [c]ourt adopts the extremely well-reasoned opinion of Judge Meyer and concludes that the effective date of the Final Rule is January 1, 2015."); *Collins v. DKL Ventures, LLC*, 215 F. Supp. 3d 1059, 1067 (D. Colo. 2016) ("Rather, this Court finds that the D.C. Circuit's decision in *Weil* must be given retroactive effect, such that the DOL's regulation is deemed to have taken effect on January 1, 2015 as stated.").  However, not all district courts have agreed with this outcome.  *See Lee v. Caregivers for Indep.*, *LLC*, 16-CV-946, 2017 WL 2666413, at *4 (S.D. Ohio June 21, 2017) ("[T]his [c]ourt likewise finds persuasive the DOL's pronouncement following the mandate that it would not enforce the Regulation until November 12, 2015 as evidence the rule should not be given retroactive effect in cases between private parties."); *Sanchez v. Caregivers Staffing Servs.*, *Inc.*, No. 15-CV-1579, 2017 WL 380912, at *2–3 (E.D. Va. Jan. 26, 2017) (refusing to apply the rule retroactively and applying it only after the D.C. Circuit reversed the initial injunction); *Bangoy v. Total Homecare Solutions, LLC*, No. 15-CV-573, 2015 WL 12672727, at *3 (S.D. Ohio Dec. 21, 2015) (holding that "permitting [the] [p]laintiffs to recover for a violation of the rule while the vacatur was in effect would give the rule an impermissible retroactive effect"); *Flamer v. Maxim Healthcare Servs. Inc.*, No. 15-CV-2070, 2015 WL 12762067, at *1 (D. Md. Oct. 26, 2015) (holding that "the effective date of the regulation referred to in the motion could not become effective on January 1, 2015").

The Ninth Circuit, which is the only Court of Appeals to rule on this question, has held that "[t]he effective date of the rule is January 1, 2015."  *Ray v. County of Los Angeles*, 935 F.3d

703, 716 (9th Cir. 2019). The Ninth Circuit's reasoning is compelling. First, the Ninth Circuit

believed that adhering to the original effective date is not impermissibly retroactive.

Specifically, the Ninth Circuit reasoned:

> To hold otherwise could encourage dilatory appellate litigation. If an erroneously
> vacated rule or regulation were not effective until sometime after the mandate
> issued in a later appeal, then a party might drag out the appellate process to avoid
> compliance for as long as possible. Put differently, an erroneous vacatur cannot
> postpone a rule's effective date until an appellate court corrects the error sometime
> in the future.

*Id.* at 715. The Ninth Circuit also responded to the argument that the DOL's choice against

enforcing the rule until November 12, 2015 eliminated the availability of private rights of action

until that date by saying that "[a]n agency's discretionary decision to hold off enforcement does

not and cannot strip private parties of their rights to do so." *Id*. at 715 (citing *Ohio Valley Envtl.*

*Coal. v. Fola Coal Co*., *LLC*, 845 F.3d 133, 145 (4th Cir. 2017)). Further, the Ninth Circuit

emphasized that "there is nothing in the several statements of the DOL, which the district court

relied on, that suggest that it intended its discretionary enforcement choices to preclude private

enforcement. Indeed, other than by amending the rule, the DOL could not have precluded

private enforcement even if it wanted to." *Id.* at 716. The Ninth Circuit thus concluded:

> The rule's original effective date remains January 1, 2015. If the DOL "intended" for the
> effective date be something other than January 1, 2015, the DOL could have sought to
> change that effective date through the procedures set out in the Administrative Procedure
> Act. Were we to hold to the contrary and impose our view that the DOL's exercise of
> discretion amended the effective date sub silentio, we would in fact be usurping the
> rulemaking authority of the DOL.

*Id.*

The Court finds the Ninth Circuit's reasoning in *Ray*, as well as the reasoning of the

majority of district courts that have opined on this issue, to be compelling. This Court therefore

follows the reasoning of these courts and concludes that the effective date of the Home Care

Rule is January 1, 2015.

Accordingly, because Defendants concede that they are obligated to pay overtime to their W-2 employees, (*see* Defs.' 56.1 ¶ 11), and because Affiliated has only paid out overtime to these employees from October 13, 2015 forward, (*id.* ¶ 13), there is no genuine dispute of material fact that Defendants owe their W-2 employees overtime payments from the period of January 1, 2015 to October 13, 2015.

### ii. Status of CDAP Staff

"The FLSA contains a broad definition for 'employees,' in accordance with the Act's remedial purpose." *Ethelberth v. Choice Sec. Co*., 91 F. Supp. 3d 339, 350 (E.D.N.Y. 2015). "It defines 'employee' as 'any individual employed by an employer' and to 'employ' as including 'to suffer or permit to work.'" *Id.* (quoting 29 U.S.C. § 203(e)(1); then quoting 29 U.S.C. § 203(g)). It does not, however, contain a definition for independent contractors. "[T]he [Supreme] Court has instructed that the determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in economic reality rather than technical concepts." *Irizarry v. Catsimatidis*, 722 F.3d 99, 104 (2d Cir. 2013) (quotation marks omitted). Accordingly, courts in the Second Circuit use an "economic realities" test to determine whether an individual is an employee or an independent contractor.

The "economic realities" test involves consideration of:

> 1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business.

*Barfield v. New York City Health & Hosps. Corp*., 537 F.3d 132, 142 (2d Cir. 2008) (quoting *Brock v. Superior Care, Inc*., 840 F.2d 1054, 1058–59 (2d Cir. 1988)). "None of the factors used in any of these cases, however, comprise[s] a rigid rule for the identification of an FLSA

employer . . . . To the contrary, . . . they provide a nonexclusive and overlapping set of factors to ensure that the economic realities test mandated by the Supreme Court is sufficiently comprehensive and flexible to give proper effect to the broad language of the FLSA." *Irizarry*, 722 F.3d at 105 (quotation marks omitted); *see also id.* at 104 ("The Second Circuit 'has treated employment for FLSA purposes as a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances' . . . ." *Id.* (quoting *Barfield*, 537 F.3d at 142). "The existence and degree of each factor is a question of fact while the legal conclusion to be drawn from those facts—whether workers are employees or independent contractors—is a question of law." *Brock*, 840 F.2d at 1059. "Therefore, individual employer liability is rarely suitable for summary judgment." *Sethi v. Narod*, 974 F. Supp. 2d 162, 187 (E.D.N.Y. 2013) (quoting *Berrios v. Nicholas Zito Racing Stable, Inc.*, 849 F. Supp. 2d 372, 393 (E.D.N.Y. 2012)). However, "a district court may rule on summary judgment if it can weigh the [] factors on the basis of facts that are not in dispute." *Wang v. Hearst Corp.*, 877 F.3d 69, 76 (2d Cir. 2017).

New York's "[CDPA Program] is a Medicaid program providing services to chronically ill or physically disabled individuals who have a medical need for assistance with daily living activities and is an alternative to traditional home health care services that enables a consumer to have a higher degree of control over his or her own care." *Wegman v. Altieri*, No. 2015/11723, 2015 WL 13298515, at *2 (N.Y. Sup. Ct. Nov. 19, 2015). It is "intended to permit chronically ill and/or physically disabled individuals receiving home care services under the medical assistance program greater flexibility and freedom of choice in obtaining such services." N.Y. Soc. Serv. Law § 365-f(1). Under the program, designated fiscal intermediaries "contract with the New York State Department of Health to provide fiscal intermediary support services in order to

24

facilitate the financial aspects of the relationship between CDPA[] participants and their chosen

Personal Assistants, and to [e]nsure compliance with the Medicaid Program and other State and

Federal employment laws." *Consumer Directed Pers. Assistance Ass'n of N.Y. State v. Zucker*,

111 N.Y.S.3d 826, 828 (N.Y. Sup. Ct. 2019).  "The fiscal intermediary processes each [CDPA's]

wages and benefits, processes all taxes and wage withholdings, complies with worker's

compensation, disability, and unemployment insurance requirements, and maintains personnel

records." *Hardgers-Powell v. Angels in Your Home LLC*, 330 F.R.D. 89, 109 (W.D.N.Y. 2019);

*see also* N.Y. Soc. Serv. Law § 365-f(4-a)(ii)(A)–(J).

Plaintiffs allege that Defendants "have final say and approval" over the amount of the

CDPA's wages.  (Pls.' 56.1 ¶ 42.)  However, Defendants respond that a Managed Care

Organization ("MCO") actually sets the billing rate, the consumers then request a pay rate, and

Affiliated either accepts or rejects the case.  (Defs.' 56.1 ¶ 42; *see also* Decl. of Barbara

Kessman ("Kessman Decl.") ¶ 10 (Dkt. No. 299) ("Rates for payments to the Fiscal Intermediary

and ultimately the [CDPAs] are set by an [MCO], and Consumers (and/or their Aids) will

routinely shop to find a Fiscal Intermediary with whom they wish to work and at a rate there are

willing to accept.").)

Plaintiffs next allege that Defendants manage all of the paperwork and testing

requirements for the CDPAs.  (Pls.' 56.1 ¶ 47.)  Specifically, Jones stated at her deposition:

A: So actually, I was employed by Affiliated.

Q. That's the way you saw it?

. . .

A. That's the way I saw it, because they are the ones who sent me to do all my tests
and medicals.  And they are the ones that pay me.  I didn't get any pay from the
son.  Affiliated paid me.

(Charney Decl. Ex. 8 ("Jones Dep."), at 27 (Dkt. No. 292-8).)  Defendants, however, counter that

although Affiliated maintains payroll dating and medical testing, the MCOs and consumers

manages the entirety of paperwork and testing requirements for the CDPAs.  (Defs.' 56.1 ¶ 47.)

Plaintiffs also allege that Defendants "introduced" CDPA aides to their clients.  (Pls.' 56.1 ¶ 50.)

Defendants respond that "[c]lients hire their own aides."  (Defs.' 56.1 ¶ 50.)  Along the same

lines, Kessman states:

> Individuals wishing to work as a CDPA[] always meet with the Consumer . . . prior
> to any engagement . . . and [a]fter meeting with the Consumer, the Consumer solely
> determines if the CDPAs will be hired . . . .

(Kessman Decl. ¶¶ 16–17.)

Finally, Plaintiffs allege that Defendants set the CDPAs' schedule and manage all aspects

of their time sheets.  (Pls.' 56.1 ¶ 51.)  Simmonds also stated at her deposition:

> Q: Okay. And did the [patient] tell you what to do? Did they give you a schedule
> of what to do?
>
> A. No.
>
> Q. Who gave you a schedule of what to do?
>
> A: I got timesheet and everything from Barbara [Kessman].
>
> Q. Who told you what you're supposed to do on a day-to-day basis?
>
> A. It's on the timesheet.

(Charney Decl. Ex. 9 ("Simmonds Dep."), at 18 (Dkt. No. 292-9).)  Defendants claim that clients

"are responsible for training and scheduling of [CDPAs]."  (Defs.' 56.1 ¶ 50.)  Kessman further

alleges that "[t]he Consumer solely determines . . . what hours the CDPAs will work, what duties

the CDPAs will perform, and what working conditions the CDPAs will be subjected to."

(Kessman Decl. ¶ 17.)

Given the competing claims between Plaintiffs and Defendants, which are supported by admissible testimony and other evidence, the Court concludes that there are disputed issues of fact which precludes summary judgment.  *See Umbrino v. L.A.R.E Partners Network, Inc*., No. 19-CV-06559, 2022 WL 452702, at *9 (W.D.N.Y. Feb. 15, 2022) ("The undisputed facts of record are not sufficient, at this point in time, to allow the [c]ourt to find as a matter of law that [a defendant] was [the p]laintiffs' employer for purposes of the FLSA and the NYLL."); *Berrios*, 849 F. Supp. 2d at 393–94 (denying summary judgment on question of whether defendant was an employer under the FLSA); *Franco v. Ideal Mortg. Bankers, Ltd*., No. 07-CV-3956, 2011 WL 317971, at *7 (E.D.N.Y. Jan. 28, 2011) (same).

### iii. Double Damages

Under FLSA settlements, "double damages [are] the norm and single damages the exception."  *Herman v. RSR Sec. Servs. Ltd*., 172 F.3d 132, 142 (2d Cir. 1999) (citing *Reich v. S. New England Telecomm. Corp*., 121 F.3d 58, 71 (2d Cir. 1997)), *holding modified on other grounds by Zheng v. Liberty Apparel Co. Inc*., 355 F.3d 61 (2d Cir. 2003).  Avoiding an imposition of liquidated double damages requires a showing that "the employer acted in subjective 'good faith' and had objectively 'reasonable grounds' for believing that the acts or omissions giving rise to the failure did not violate the FLSA."  *Id.*  Similarly, the NYLL awards double damages unless the employer can "prove [] a good faith basis to believe that its underpayment of wages was in compliance with the law . . . ."  N.Y. Lab. Law § 198(1-a). "Although the text of the NYLL's liquidated damages provisions does differ from that of the FLSA's liquidated damages provision, courts have not substantively distinguished the federal standard from the current state standard of good faith."  *Garcia v. JonJon Deli Grocery Corp*., No. 13-CV-8835, 2015 WL 4940107, at *5 (S.D.N.Y. Aug. 11, 2015) (quotation marks omitted).

27

"To establish good faith, the employer must take active steps to ascertain the dictates of the FLSA and then act to comply with them." *Inclan v. New York Hosp. Grp*., *Inc*., 95 F. Supp. 3d 490, 504 (S.D.N.Y. 2015) (quoting *Herman*, 172 F.3d at 142).

Plaintiffs argue that they are entitled to double damages because "Defendants cannot make the required showing that they had a good faith basis to believe its underpayment to the W-2 employees was in compliance with the law, or that the 1099 aides were properly classified as independent contractors." (Pls.' MSJ Mem. 15.) Defendants fail to address this issue with respect to the W-2 employees/PCAs in any of their submissions. (*See generally* Defs.' MSJ Mem.; Defs.' MSJ Opp'n; Defs.' Reply Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' MSJ Reply") (Dkt. No. 322).) As such, the Court deems this issue abandoned by Defendants. *See Scott v. JPMorgan Chase & Co.*, No. 13-CV-646, 2014 WL 338753, at *10 (S.D.N.Y. Jan. 30, 2014) ("[The] [p]laintiff's opposing [m]emorandum of [l]aw does not respond to this argument, and effectively concedes these arguments by his failure to respond to them." (quoting *Miles v. Walawender*, No. 10-CV-973, 2013 WL 1908304, at *1 (W.D.N.Y. May 7, 2013))) (collecting cases); *Robinson v. Am. Int'l Grp., Inc.*, No. 08-CV-1724, 2009 WL 3154312, at *4 & n.65 (S.D.N.Y. Sept. 30, 2009) (collecting cases holding that where a party fails to address arguments in opposition papers on a summary judgment motion, the claim is deemed abandoned).

However, because the Court finds that there was a genuine issue of material fact with respect to whether Defendants properly categorized the I-9 employees/CDPAs as independent contractors, *see supra*, the Court will not opine at this time on whether Defendants believed in good faith that their actions did not violate the FLSA or NYLL with respect to this claim.

<u>iv. Wage Notice and Statement Violations</u>

"The NYLL [] requires employers to provide, at the time of hiring, a wage notice to employees hired after April 9, 2011, and to provide each employee with accurate wage statements with every payment of wages." *Pena v. Metro. Wireless Anandpur Inc*., No. 21-CV-2239, 2021 WL 5054368, at *4 (S.D.N.Y. Nov. 1, 2021) (citing N.Y. Lab. Law § 195(1)(a), (3)); *see also Ergin v. 8th Hill Inc. et al.*, No. 20-CV-4594, 2022 WL 828303, at *4 (S.D.N.Y. Mar. 18, 2022).[8]  "The wage notice at hiring must be written in English and the employee's primary language and must include the employee's rate of pay, pay period and date, any allowances taken from the wages, and the employer's contact information." *Galvez, et al. v. 800 Ginza Sushi Inc*., No. 19-CV-8549, 2022 WL 748286, at *16 (S.D.N.Y. Mar. 11, 2022).  "The employer must obtain a signed acknowledgment of the wage notice from the employee and preserve that written acknowledgment for six years." *Id.* (citing N.Y. Lab. Law § 195(1)(a)).  In addition to the wage notice requirement,

> employers are also required to provide employees with a wage statement with each payment of wages.  Each wage statement must list, inter alia, the dates of work covered by that payment of wages, the employer's address and phone number, the applicable rate or rates of pay, applicable deductions, and any allowances claimed as part of the minimum wage.

*Java v. El Aguila Bar Rest. Corp*., No. 16-CV-6691, 2018 WL 1953186, at *12 (S.D.N.Y. Apr. 25, 2018) (citing N.Y. Lab. Law § 195(3)) (alterations, italics, and quotation marks omitted).

---

[8] "Violations of Section 195(1) did not always result in money damages.  It was not until April 9, 2011, when New York's Wage Theft Prevention Act ('WTPA') took effect, that employers were subject to damages for not providing wage notices." *Gamero v. Koodo Sushi Corp*., 272 F. Supp. 3d 481, 510 (S.D.N.Y. 2017), *aff'd*, 752 F. App'x 33 (2d Cir. 2018).  "For plaintiffs hired before the WTPA took effect on April 9, 2011, the failure to provide a wage notice is insufficient to support a WTPA claim because the Second Circuit Court of Appeals has held that the WTPA does not apply retroactively." *Cucu v. 861 Rest. Inc*., No. 14-CV-1235, 2017 WL 2389694, at *6 (S.D.N.Y. June 1, 2017) (citing *Gold v. N.Y. Life Ins. Co.,* 730 F.3d 137, 143–44 (2d Cir. 2013)).

"Since February 25, 2015, the statutory damages for violating the notice requirement [in §

195(1)(a)] has been up to $50 per workday for a maximum of $5,000.00." *Ergin*, 2022 WL

828303, at *4 (citing N.Y. Lab. Law § 198(1-b)).  And the statutory damages for violating the

wage notice requirement in in § 195(3) is "$250 dollars 'for each work day that the violations

occurred or continue to occur,' not to exceed $5,000." *Pena*, 2021 WL 5054368, at *4 (quoting

N.Y. Lab. Law § 198(1-d)).

First, Plaintiffs allege that "Defendants failed to comply with the wage notice

requirements of [§] 195(1)(a)."  (Pls.' MSJ Mem at 18).  Defendants argue that they did provide

wage notices.  (Defs.' MSJ Opp'n 16.)  In support of this assertion, Defendants provide a copy of

an email sent by Kessman on March 15, 2016, to 54 aides.  (*See* Decl. of Steven Felsenfeld, Esq.

("Felsenfeld Decl.") Ex. X, at 2 (Dkt. No. 305-24).)  This email states in part:

> We are required to notify you of the hourly rates we pay our employees.  As most
> of you are aware, rates vary between $9.00 (minimum wage) and $15.0 per hour
> depending on the program, individual client's needs, etc. . . . As you know, before
> we give you a new assignment, we communicate the rate of pay, i.e., same rate or
> increase or decrease.  You will always be aware of the rate at which each client
> pays.

(*Id.*)  The email goes on to request that the aids sign a copy of an attached form verifying that

that they received the foregoing information.  (*Id.*)  Plaintiffs, however, point out that Defendants

"have failed to produce a single wage notice form that has been signed by the staff person and

acknowledged as received."  (Pls.' Reply. Mem. of Law. in Supp. of Mot. for Summ. J. ("Pls.'

MSJ Reply") 14 (Dkt. No. 312).) [9]  Plaintiffs further argue that the "email (and presumably the

attachment) was sent to only 54 staff members leaving out the many hundreds of wage notice

---

[9] Plaintiffs write, "Plaintiffs have failed to produce a single wage notice form that has
been signed by the staff person and acknowledged as received," (*id.*), but the Court will assume
that this was in error, and that Plaintiffs meant to write "Defendants" instead of "Plaintiffs."

putative class members for whom no notice was produced during discovery." (*Id.* at 15.) Defendants also submitted photographs of posters that Affiliated displayed, which set forth the applicable wage-and-hour laws. (*See* Felsenfeld Decl. Ex. Y (Dkt. No. 305-25.)  However, courts in this district have found that "such posted notices do not meet the individualized notice requirements of NYLL § 195(1)(a)." *Chichinadze v. BG Bar Inc.*, 517 F. Supp. 3d 240, 259 (S.D.N.Y. 2021); *see also Pineda v. Frisolino, Inc.,* No. 15-CV-3774, 2017 WL 3835882, at *12 n.15 (S.D.N.Y. Aug. 29, 2017) ("Although [the] [d]efendants posted a notice entitled 'New York Labor Law Poster' as of January 2015, those posters do not satisfy N.Y. Labor Law § 195(1), which requires individualized notices to each employee detailing their rate of pay and basis thereof.").

Essentially, Plaintiffs claim that Defendants did not provide wage notices, and Defendants claim that they did.  The email and photographs of posters that Defendants provided are insufficient on their own to support Defendants' contention.  On this record, the Court finds that there is a genuine dispute of material fact as to whether every named Plaintiff hired after April 9, 2011 received a wage notice statement at the time of hire.  *See Hardgers-Powell*, 330 F.R.D. at 113 ("[A]s to whether [the plaintiff] received a compliant wage notice at the time of hire, there is a factual dispute that precludes summary judgment."); *Jeong Woo Kim v. 511 E. 5th St., LLC*, 133 F. Supp. 3d 654, 663 (S.D.N.Y. 2015) (denying summary judgment as to wage notice claim where the defendant made "inconsistent statements regarding whether notices were furnished" and plaintiffs did not state "under oath that they did not receive a timely wage notice.").

Plaintiffs, however, also allege that the wage statements that Defendants provided did not satisfy the requirements of § 195(3).  (Pls.' MSJ Mem. 19).  And as Plaintiffs point out,

"Defendants do not address and appear not to oppose Plaintiffs' [M]otion with respect to wage statement violations under . . . § 195(3)." (*Id.*)  As such, the Court deems this issue abandoned by Defendants. *See Scott*, 2014 WL 338753, at *10; *Robinson*, 2009 WL 3154312, at *4 & n.65.

Accordingly, the Court denies both Plaintiffs' and Defendants' motions for summary judgment on the issue of wage notices in violation of § 195(1)(a), but grants Plaintiff's Motion for summary judgment on the issue of wage statements in violation of § 195(3).

### v.  Kessman's Individual Liability

New York law provides that a non-public corporation's ten largest shareholders may be held personally liable for "all debts, wages[,] or salaries due and owing to any of its laborers, servants or employees . . . for services performed by them for such corporation."  N.Y. Bus. Corp. Law § 630(a).  "However, in order to invoke [this] provision[], an employee is required to serve the subject shareholders or members with notice of his intent to hold them liable within 180 days of the termination of his services." *Imbarrato v. Banta Mgmt. Servs., Inc.*, No. 18-CV-5422, 2020 WL 1330744, at *5 (S.D.N.Y. Mar. 20, 2020).  "Moreover, an action to enforce such liability is required to be commenced within 90 days 'after an execution unsatisfied' against the corporation or limited liability company 'upon a judgment recovered against it for such services.'" *Id.* (quoting N.Y. Bus. Corp. Law § 630(a)).  "[T]his provision of New York law ensures that those who benefit from the underpaid labors of their employees may not be relieved of liability; instead, they may be held personally liable." *Hong v. Mito Asian Fusion, Inc.*, No. 19-CV-3149, 2021 WL 5409267, at *3 n.3 (E.D.N.Y. Aug. 9, 2021) (alteration and quotation marks omitted).

Alves, on behalf of herself and all others similarly situated, notified Kessman in writing within 180 days of her termination that she intended to hold Kessman personally liable.  (*See*

Charney Decl. Ex. 3 (Dkt. No. 292-3).)  Plaintiffs therefore argue that they have "satisfied the requirements of § 630, and request a finding that Defendant Kessman is individually liable for any and all of the damages in the event Affiliated fails to satisfy any resulting judgment."  (Pls.' MSJ Mem. 18.)  However, this would be premature.  As Plaintiffs recognize, this individual liability only attaches if there is a judgment against Affiliated and Affiliated fails to satisfy the judgement.  Thus, this issue may be addressed at the appropriate time, but because there is no final judgment, that time is not now.[10]  *See Cicero v. Intellor Grp., Inc*., No. 18-CV-6934, 2021 WL 1720810, at *6 (W.D.N.Y. Apr. 30, 2021) (dismissing claim alleging that shareholder defendant was personally liable for corporation's unpaid wages under § 630 where both parties acknowledged that "a condition precedent to such a claim is that the plaintiff must first obtain a judgment against the corporation, and that the judgment be unsatisfied by the corporation"); *Wing v. E. River Chinese Rest.*, 884 F. Supp. 663, 668 (E.D.N.Y. 1995) ("In the instant case, judgment has not been entered in the underlying wage and hour action against [the corporate defendant]. The issue of shareholder liability with respect to this action is therefore procedurally premature.").

---

[10]  The Court further notes that Section 630(a) may not be relevant if Kessman qualifies as an "employer" under New York Labor Law and the FLSA.  *See* 29 U.S.C. § 203(d) (defining an "employer" as any "person acting directly or indirectly in the interest of an employer in relation to an employee"); *Ream v. Hill*, No. 16-CV-7462, 2018 WL 3579846, at *3 (S.D.N.Y. July 24, 2018); *Ramirez v. Riverbay Corp.*, 35 F. Supp. 3d 513, 521 n.2 (S.D.N.Y. 2014); *see also Sethi v. Narod*, 974 F. Supp. 2d 162, 188 (E.D.N.Y. 2013) ("District courts in this Circuit 'have interpreted the definition of "employer" under the [NYLL] coextensively with the definition used by the FLSA.'" (quoting *Spicer v. Pier Sixty LLC*, 269 F.R.D. 321, 335 n.13 (S.D.N.Y. 2010))).

### c. Restrictive Covenant Counterclaim

In a September 17, 2017 Opinion & Order, (*see* (Sept. 2017 Op. & Order ("Sept. 2017 Op.") 2 (Dkt. No. 72), this Court preliminarily addressed Defendants' Counterclaim against Plaintiff for breach of contract. (*See* Answer to Am. Compl. ¶¶ 102–32 ("Counterclaim") (Dkt. No. 11).) The Court briefly recites the facts relevant to the Counterclaim as recounted in its prior opinion. (*See* Sept. 2017 Op. at 2–5.)

"[Alves] approached Affiliated seeking employment as a PCA with it, on or about October 2, 2006." (Counterclaim ¶ 102.) On October 6, 2006, "as a condition of . . . [e]mployment," Alves entered into a contract with Affiliated, "wherein she agreed 'not to accept employment, either directly or indirectly from any client of Affiliated to whom [she had] been assigned, for at least 90 days after the last day of [her] assignment.'" (*Id.* ¶ 103.) From April 1, 2013 to November 4, 2015, Alves "was assigned to provide services . . . to Aida Goncalez, a client of Affiliated." (*Id.* ¶ 105.)

From April 1, 2013, to July 1, 2014, Ms. Goncalez's Medicaid insurance carrier, Fidelis Care, was billed by Affiliated at a rate of $22.00 per hour, during which time Alves was paid $14.00 per hour. (*See id.* ¶¶ 106, 108.) On July 1, 2014, the rate billed to Fidelis Care was reduced to $18.55. (*See id.* ¶ 107.) Defendants informed Alves that as a result of this reduction, her rate of pay would be reduced to $13.00 per hour. (*See id.* ¶ 109.)

In early October 2015, Ms. Goncalez's daughter, Christine Bleakley, contacted Defendants to request that the aides servicing her mother be compensated at a higher rate. (*See id.* ¶ 114.) Defendants responded that they were unable to do so because of the reduction in the rate billed to Fidelis Care. (*See id.*) Ms. Bleakley stated that "she would have to find another agency that would pay more money to the girls hourly" and that she "would like to take

34

[Alves]." (*Id.* ¶ 115 (alteration and internal quotation marks omitted).)  Ms. Bleakley "acknowledged [that] she understood [Avles'] [c]ontract," but asked Defendants to break it. (*Id.* ¶ 117.)  Defendants declined to do so, and Ms. Bleakley stated that "she would 'abide' by the [c]ontract and not hire [Alves.]" (*Id.* ¶ 118.)  Ms. Bleakley also told Defendants that "she had approached a competitor of Affiliated, Concepts of Independence, Inc. ("COI"), secured for the 'girls' an increase in remuneration of one ($1) dollar per hour over what [Alves] was being paid at Affiliated, and had agreed to direct Ms. Goncalez to COI as her care provider." (*Id.*)

On November 4, 2015, Ms. Goncalez left the care of Affiliated and became a client of COI. (*See id.* ¶ 119.)  On December 4, 2015, "[Alves] contacted [D]efendants by telephone to inform [them] she was going to 'take a break' from her [e]mployment and would not be working for a while." (*Id.* ¶ 122.)  Defendants did not contest Alves' decision to "take a break," but reminded Alves that she "signed a [c]ontract with Affiliated that [she] could not work on the same client for 90 days." (*Id.* ¶ 123 (internal quotation marks omitted).)  Defendants added that "[a]fter the 90 days, if [she] ch[]ose to, [she] [could] go back to that same client." (*Id.* (internal quotation marks omitted).)  Alves told Defendants that she understood these terms. (*See id.* ¶ 124.)

Defendants allege that "on or about December 5, 2015 (if not in the weeks immediately prior thereto)," "[Avles] began employment with COI," "in direct competition with, and to the detriment of, Affiliated." (*Id.* ¶¶ 125, 127.)  On December 9, 2015, Defendants' general counsel informed Plaintiff in writing that she was in breach of her contract with Affiliated. (*See id.* ¶ 126.)  Defendants allege that that as a result of Alves' purported breach, Affiliated has been damaged in the amount of $40,068.00 of loss of income. (*Id.* ¶¶ 128–30 (alteration and internal quotation marks omitted).)

"New York courts adhere to a strict approach to enforcement of restrictive covenants because their enforcement conflicts with the general public policy favoring robust and uninhibited competition, and powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood." *Poller v. BioScrip, Inc*., 974 F. Supp. 2d 204, 214 (S.D.N.Y. 2013) (quoting *Kelly v. Evolution Markets, Inc.*, 626 F. Supp. 2d 364, 371 (S.D.N.Y. 2009)); *see also Nostrum Pharms., LLC v. Dixit*, No. 13-CV-8718, 2016 WL 5806781, at *15 (S.D.N.Y. Sept. 23, 2016) ("Restrictive covenants are disfavored because of the 'powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood' as well as the 'general public policy favoring robust and uninhibited competition.'" (quoting *Ashland Mgmt. Inc. v. Altair Investments NA, LLC*, 869 N.Y.S.2d 465, 471 (App. Div. 2008))). "It is well established under New York law that restrictive covenants in employment agreements are enforceable only to the extent that they satisfy the overriding requirement of reasonableness." *Payment Alliance Int'l Inc. v. Ferreira*, 530 F. Supp. 2d 477, 484 (S.D.N.Y. 2007) (internal quotation marks omitted)). Thus, "[r]estrictive covenants are unenforceable under New York law unless reasonable in scope, duration, and geographic area." *Nostrum Pharms.*, 2016 WL 5806781, at *15. More particularly, "an employee agreement not to compete will be enforced only if it is [(1)] reasonable in time and area, [(2)] necessary to protect the employer's legitimate interests, [(3)] not harmful to the general public[,] and [(4)] not unreasonably burdensome to the employee." *Poller*, 974 F. Supp. 2d at 214 (alteration and internal quotation marks omitted). "A violation of any prong renders the [non-compete] invalid." *Flatiron Health, Inc. v. Carson*, No. 19-CV-8999, 2020 WL 1320867, at *19 (S.D.N.Y. Mar. 20, 2020) (quoting *BDO Seidman v. Hirshberg*, 712 N.E.2d 1220, 1223 (N.Y. 1999)).

In its September 2017 Opinion & Order, the Court found that the restrictive covenant was appropriate in its scope, (Sept. 2017 Op. at 10), did not impose an undue hardship on Alves, (*id.* at 11), and served the Defendants legitimate interests in protecting the goodwill of Defendants' business, (*id.* at 14.)  However, the Court did find that the restrictive covenant was harmful to the general public because the "type of restrictive covenant at issue here not only limits employment choices for individuals like [Alves], but negatively limits choices of a particularly vulnerable population— individuals in need of home healthcare." (*Id.* at 12.)  The Court ultimately found, however, that "it is plausible that the restrictive covenant was not unreasonable" and thus Court declined to find it unenforceable at that time. (*Id.* at 14.)

Although both Parties declare that they are entitled to summary judgment on this claim, (*see* Pls.' MSJ Mem. 20–22; Defs.' MSJ Mem. 6–7), neither Party has met its burden.  Indeed, neither Party includes relevant facts in their respective 56.1 Statements.  (*See generally* Pls.' 56.1; Defs.' 56.1.)  Neither do the Parties point to sufficient evidence in the record with which to persuade the Court that no genuine dispute of material fact exists with respect to this issue.  In fact, Plaintiffs do not cite to the record at all.  (*See* Pls.' MSJ Mem. 20–22; Pls.' MSJ Opp'n 2–3; Pls.' MSJ Reply 16.)  Although Defendants make two citations to the record, these citations do not come close to proving that no genuine dispute of material fact exists with respect to this issue.[11]  Instead, the Parties rely almost entirely on this Court's September 2017 Opinion &

---

[11] Defendants' first citation is incorrect.  Defendants argue, in "her deposition [Alves] acknowledged that she knew and understood her obligations to Affiliated, and notwithstanding such understanding, breached those obligations," (Defs.' MSJ Mem. at 6), citing to page 52 of Exhibit I to the Felsenfeld Declaration, (*id.* 6–7.)  That citation does not exist: there are only 51 pages in Exhibit I to the Felsenfeld Declaration.  (*See* Felsenfeld Decl. Ex. I (Dkt. No. 305-9).)  Defendants' second citation is to page 45 of Exhibit O to the Felsenfeld Declaration, which Defendants claim shows that Alves breached her contract with Affiliated.  (*See* Defs.' MSJ Reply at 7.)  Although this citation is in fact to Alves' deposition, the specific page cited does

Order, which found that it was "*plausible* that the restrictive covenant was not unreasonable," (Sept. 2017 Op. at 14 (emphasis added)), under the standard of review for a motion for judgment on the pleadings—which is a much lower bar than the standard for summary judgment. *Compare Sellers*, 842 F.2d at 642 ("Judgment on the pleadings is appropriate where material facts are undisputed and where a judgment on the merits is *possible* merely by considering the contents of the pleadings.") (emphasis added)), *with Wrobel*, 692 F.3d at 30 ("To survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,' (emphasis omitted) (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 586–87)), *and Guardian Life Ins. Co.*, 45 F. Supp. 3d at 322 (noting that at the summary judgment stage, a nonmovant "cannot rely on the mere allegations or denials contained in the pleadings . . . ." (internal quotation marks omitted)).

Because neither Party has met its burden, the Court denies both Plaintiffs' and Defendants' Motions for Summary Judgment on Defendants' Counterclaim.

---

not, as Defendants suggest, pertain to whether Alves breached her employment with Affiliated. This page reads:

> Q: Okay. Do you have any documents that reflect the address of the office you work at?
>
> A: I have it at home, not here with me.
>
> Mr. Felsenfeld: A copy of that as well.
>
> Mr. Stafford: Fine.

(Felsenfeld Decl. Ex. O ("Alves Dep. Tr.") at 45 (Dkt. No. 305-15).)

B. Collective Action Final Certification

      1. Applicable Law

    "The FLSA authorizes a plaintiff to file suit on behalf of 'other employees similarly situated,' but only if such employees 'consent in writing.'" *LoCurto v. AT&T Mobility Servs. LLC*, No. 13-CV-4303, 2018 WL 4519201, at *3 (S.D.N.Y. Sept. 20, 2018) (quoting 29 U.S.C. § 216(b)). "Potential plaintiffs must, therefore, 'opt in' to participate in an FLSA collective action." *Id.* "[D]istrict courts have discretion . . . to implement § 216(b) . . . by facilitating notice to potential plaintiffs of the pendency of the action and of their opportunity to opt in as represented plaintiffs." *Id.* (second and third alteration in original) (quoting *Myers v. Hertz Corp.*, 624 F.3d 537, 554 (2d Cir. 2010)).

    "Courts in th[e] [Second] Circuit use a two-step method in assessing whether to certify a collective action." *Desilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 27 F. Supp. 3d 313, 319 (E.D.N.Y. 2014) (citing *Myers*, 624 F.3d at 554). "At the first stage, courts must evaluate whether the plaintiff's allegations satisfy the 'modest factual showing' required at that stage to determine whether the named plaintiffs and potential opt-in plaintiffs 'together were victims of a policy or plan that violated the [FLSA].'" *LoCurto*, 2018 WL 4519201, at *3 (quoting *Myers*, 624 F.3d at 555); *see also Sanchez v. Gansevoort Mgmt. Grp., Inc.*, No. 12-CV-75, 2013 WL 208909, at *1 (S.D.N.Y. Jan. 10, 2013) ("[At the first step,] [t]he burden may be satisfied through the pleadings and affidavits alone."). On February 7, 2017, this Court found that Alves had "made the requisite 'modest factual showing,' *Myers*, 624 F.3d at 555, and grant[ed] [Alves'] motion for conditional certification." (Feb. 2017 Op. at 10.)

    At the second stage, "the Court must apply heightened scrutiny in determining whether Plaintiffs are similarly situated for the purposes of the FLSA." *Desilva*, 27 F. Supp. 3d at 319;

*see also Myers*, 624 F.3d at 555 ("At the second stage, the district court will, on a fuller record, determine whether a so-called 'collective action' may go forward by determining whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs."). At this second stage, the "burden is on the named plaintiff to prove that the other employees are similarly situated." *Zivali v. AT & T Mobility, LLC*, 784 F. Supp. 2d 456, 460 (S.D.N.Y. 2011). Although "the standard is higher at this second stage, the 'similarly situated' requirement of 29 U.S.C. § 216(b) is considerably less stringent than the requirement of Fed. R. Civ. P. 23(b)(3) that common questions 'predominate.'" *Alonso v. Uncle Jack's Steakhouse, Inc*., No. 08-CV-7813, 2011 WL 4389636, at *3 (S.D.N.Y. Sept. 21, 2011) (citation and quotation marks omitted). According to the Second Circuit, "to be 'similarly situated' means that named plaintiffs and opt-in plaintiffs are alike with regard to some material aspect of their litigation." *Scott v. Chipotle Mexican Grill, Inc*., 954 F.3d 502, 516 (2d Cir. 2020), *cert. dismissed*, 142 S. Ct. 639 (2021). The Second Circuit further explains:

> That is, party plaintiffs are similarly situated, and may proceed in a collective, to the extent they share a similar issue of law or fact material to the disposition of their FLSA claims. It follows that if named plaintiffs and party plaintiffs share legal or factual similarities material to the disposition of their claims, dissimilarities in other respects should not defeat collective treatment. . . . If the opt-in plaintiffs are similar to the named plaintiffs in some respects material to the disposition of their claims, collective treatment may be to that extent appropriate, as it may to that extent facilitate the collective litigation of the party plaintiffs' claims.

*Id.* (citation and quotation marks omitted).

### 2. Application

Plaintiffs argue that all Party Plaintiffs are similarly situated because "the collective action consists solely of individuals who performed home care aide services for Defendants for more than 40 hours in a week, were paid on an hourly basis and did not receive overtime compensation." (Pls.' Mem. of Law in Supp. of Mot. for Class Cert. & Final Collective Action

40

Cert. ("Pls.' Class Cert. Mem.") 12 (Dkt. No. 288).)  The Court agrees.  "The record in this matter supports the conclusion that Plaintiffs were employed by Defendants in sufficiently similar roles and that there are common issues of law and fact regarding whether they were paid the minimum wage required by law." *Cardenas v. A.J. Piedimonte Agric. Dev.*, LLC, No. 18-CV-00881, 2020 WL 3469681, at *2 (W.D.N.Y. June 25, 2020) (finding the plaintiffs to be similarly situated because the "collective action consists solely of individuals who performed physical labor for [the] [d]efendants for more than 40 hours in a week and were paid on an hourly basis but did not receive overtime compensation"); *see also Foster v. City of New York*, No. 14-CV-4142, 2021 WL 1191810, at *6–7 (S.D.N.Y. Mar. 30, 2021) (finding that the plaintiffs met the "low bar" established in *Scott* for satisfying the "similarly situated" test where the plaintiffs  "worked overtime for which they were not compensated"); *Stock v. Xerox Corp.*, 516 F. Supp. 3d 308, 310–12 (W.D.N.Y. 2021) (finding the plaintiffs to be similarly situated where they "frequently worked more than 40 hours in a week and were not compensated at a rate of one-and-a-half times their regular rate as required by the FLSA and applicable state laws."); *Campbell,* 2020 WL 2792978, at *5 (finding the plaintiffs to be similarly situated where the plaintiffs were required to work through meal breaks, but where not paid for this time because this "custom or practice may well violate the FLSA" and there were "common questions of fact and law among the [p]laintiffs").

C. Class Certification

### 1. Applicable Law

"A plaintiff seeking certification of a class must demonstrate that the proposed class action fulfills the four requirements of [Federal] Rule [of Civil Procedure] 23(a)." *Davis v. Lenox Hill Hosp.*, No. 03-CV-3746, 2004 WL 1926086, at *5 (S.D.N.Y. Aug. 31, 2004).  Those

requirements are: numerosity, commonality, typicality, and adequacy.  *See LoCurto*, 2018 WL 4519201 at *11; *see also* Fed. R. Civ. P. 23(a).  The Court then asks whether "the questions of law or fact common to the class members predominate over any questions affecting only individual members, and [ ] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  "If all four Rule 23(a) requirements and Rule 23(b)(3) are satisfied, the Court may certify the class."  *LoCurto*, 2018 WL 4519201 at *11 (citing *Ramirez v. Riverbay Corp*., 39 F. Supp. 3d 354, 361 (S.D.N.Y. 2014)).  Plaintiffs bear the burden of establishing that the proposed class meets each of the requirements by a preponderance of the evidence.  *See id*.  The Court must consider "all of the relevant evidence admitted at the class certification stage."  *In re Initial Public Offerings Sec. Litig*., 471 F.3d 24, 42 (2d Cir. 2006).

"Where, as here, a party is seeking certification of an FLSA collective action and NYLL class action based on the same set of facts, courts in this Circuit favor certification of the NYLL class where the court grants certification of the FLSA collective."  *LoCurto*, 2018 WL 4519201 at *11; *see also Damassia v. Duane Reade, Inc*., 250 F.R.D. 152, 163 (S.D.N.Y. 2008) ("[C]ourts in the Second Circuit routinely certify class action[s] in FLSA matters so that New York State and federal wage and hour claims are considered together." (quoting *Duchene v. Michael L. Cetta, Inc*., 244 F.R.D. 202, 204 (S.D.N.Y. 2007)) (collecting cases); *Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 202–03 (S.D.N.Y. 2006) ("[W]here a collective action under the FLSA that is based on the same set of facts has been approved, there is an inclination to grant class certification of state labor law claims.").

2. Application

Plaintiffs move for class certification on their NYLL claims of three subclasses. (*See* Pls.' Class Cert. Mem. 1.) The first is the "Overtime Employee Subclass," which consists of "[a]ll current or former employees of Defendants who were paid on a W-2 during their employment who provided care, assistance or companionship to individuals within their homes during the period January 1, 2015 to the present and who were not paid [overtime] for all hours worked in excess of forty in a single workweek." (*Id.*) The second is the "Overtime Misclassified Subclass," which consists of "[a]ll current or former employees of Defendants who were paid on a 1099 during their employment who provided care, assistance or companionship to individuals within their homes during the period January 1, 2015 to the present and who were not paid [overtime] for all hours worked in excess of forty in a single workweek." (*Id.* at 1–2.) The third is the Wage Theft Prevention Act Subclass," which consists of "[a]ll current or former members of the Overtime Employee Subclass and the Overtime Misclassified Subclass who at any time since January 1, 2015 to the filing of this action through the entry of final judgment in this matter, did not receive proper written notices as required under the Wage Theft Prevention Act." (*Id.* at 2.)

a. Numerosity

"To satisfy Rule 23(a)(1)'s numerosity requirement, Plaintiffs must show that 'the class is so numerous that joinder of all members is impracticable.'" *Zivkovic v. Laura Christy LLC*, 329 F.R.D. 61, 68 (S.D.N.Y. 2018) (quoting Fed. R. Civ. P. 23(a)(1)). "In this Circuit, numerosity is presumed when the putative class has at least forty members." *Id.* at 68–69 (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)). "For classes with fewer than twenty members, however, joinder is generally deemed practical." *In re Namenda*

43

*Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 202 (S.D.N.Y. 2018).  However, "[t]he inquiry is not strictly mathematical," *id.* (citing *Pa. Pub. Sch. Empls. Ret. Sys. v. Morgan Stanley & Co.*, Inc., 772 F.3d 111, 120 (2d Cir. 2014)), and "the district court must analyze each case separately to determine whether the numerosity requirement has been satisfied," *id.*  "Relevant considerations include judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial resources of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members."  *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993).

Plaintiffs claim, based on Freed's analysis of the ADP Data, that there are 83 members in the Overtime Employee Subclass, 229 members in the Overtime Misclassified Subclass, and 270 members in the Wage Prevention Subclass.  (*See* Pls.' Class Cert. Mem. 5; *see also* Pls.' 56.1 ¶ 24.)  Plaintiffs also point out that Defendants concede that there are at least 42 members in the Overtime Employee Subclass because they did not oppose this fact in Plaintiffs' 56.1 Statement.  (*See* Pls.' 56.1 ¶ 19; *see generally* Defs.' 56.1.)  As noted above, "numerosity is presumed where a putative class has forty or more members."  *Shahriar v. Smith & Wollensky Rest. Grp.*, 659 F.3d 234, 252 (2d Cir. 2011) (citing *Consol. Rail*, 47 F.3d at 483).  In their Opposition, Defendants argue that there are at most 30 members of the class.  (Defs.' Mem. of Law in Opp'n to Pls.' Mot. for Class Cert. & Final Collective Action Cert. ("Defs.' Class Cert. Opp'n") 15–16 (Dkt. No. 301).)  Even if there are only 30 members of the class, the Court finds that the numerosity requirement would be satisfied, given the impracticality of joinder, the modest financial resources of the class members, and considerations of judicial economy.  *See Preldakaj v. Monarch Condo.*, No. 20-CV-9433, 2021 WL 5306028, at *2 (S.D.N.Y. Nov. 15, 2021) (conditionally certifying class of fewer than 30 members because "joinder would be impractical

given the relative size of the claims at issue and modest financial resources of the class members, and judicial economy favors avoiding individual actions particularly where the defendant is amenable to a class settlement").

### b. Commonality & Typicality

"Commonality requires that there exist questions of law or fact that are both common to the class and answerable through a class-wide proceeding." *In re Namenda*, 331 F. Supp. 3d at 202 (citing Fed. R. Civ. P. 23(a)(2)); *see also Dial Corp. v. News Corp*., 314 F.R.D. 108, 113 (S.D.N.Y. 2015). "The Supreme Court has clarified that this prong also requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Id.* (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). "In wage cases, the commonality requirement is usually satisfied where the plaintiffs allege that defendants had a common policy or practice of unlawful labor practices." *Spencer v. No Parking Today, Inc*., No. 12-CV-6323, 2013 WL 1040052, at *15 (S.D.N.Y. Mar. 15, 2013) (quoting *Poplawski v. Metroplex on the Atl., LLC*, No. 11–CV–3765, 2012 WL 1107711 at *7 (E.D.N.Y. Apr. 2, 2012)), *report and recommendation adopted*, 2013 WL 2473039 (S.D.N.Y. June 7, 2013).

"Typicality 'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" *In re Namenda*, 331 F. Supp. 3d at 202 (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997)). "Similar considerations animate commonality and typicality such that the analyses under Rules 23(a)(2) and (3) tend to merge." *Id.*; *see also Marisol A*., 126 F.3d at 376.

Plaintiffs argue that there are common questions of law for each subclass, including whether Defendants were required to pay subclass members overtime from January 1, 2015, and whether Defendants provided wage notices and statements as required by the NYLL to all

subclass members.  (*See* Pls.' Class Cert. Mem. 6–7.)  Consequently, Plaintiffs argue,

Defendants "committed the same wrongful acts in the same manner against all members of the

Class." (*Id.* at 7.)  Additionally, Defendants do not specifically challenge the typicality and

commonality requirements.  (*See generally* Defs.' Class Cert. Opp'n.)  Thus, "[h]aving reviewed

the record, and given the absence of any objection by Defendants, the Court is satisfied that this

requirement is met." *Hardgers-Powell*, 330 F.R.D. at 103.

        <u>c. Adequacy</u>

Adequacy requires that "the representative parties fairly and adequately protect the

interests of the class." Fed. R. Civ. P. 23(a)(4).  Courts must ensure that "members of the class

possess the same interests, and that no fundamental conflicts exist among members." *Charron v.*

*Wiener*, 731 F.3d 241, 249 (2d Cir. 2013).  "Adequacy is a two-step process: '[1] the proposed

class representative must have an interest in vigorously pursuing the claims of the class, and [2]

must have no interests antagonistic to the interests of other class members.'" *Mujo v. Jani-King*

*Int'l, Inc.*, 16-CV-1990, 2019 WL 145524, at *6 (D. Conn. Jan. 9, 2019) (quoting *Denney v.*

*Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006)).

The Court finds that Plaintiffs meet the adequacy requirements, nor do the Defendants

specifically object to this finding.  (*See generally* Defs.' Class Cert. Opp'n.)  This is because

"[n]o conflict has been identified between and among the representatives of the class,"

"[t]hroughout the litigation, Plaintiffs have appeared to represent the interests of their fellow

class members," "Plaintiffs have also vigorously pursued the claims of the class," and "[t]here is

also nothing to indicate that class counsel lack competence." *Mujo*, 2019 WL 145524, at *6; *see*

*also Hardgers-Powell*, 330 F.R.D. at 103 (finding adequacy requirement satisfied where the

defendants "do not contend that [the] [p]laintiffs possess any interests antagonistic to the remainder of the subclass or that class counsel are unqualified to conduct the litigation.").

### d. Predominance

"The predominance requirement is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013) (quotation marks omitted). Although "commonality, typicality, and predominance overlap," *Wynn v. N.Y.C. Hous. Auth.*, 314 F.R.D. 122, 128 (S.D.N.Y. 2016), predominance is "even more demanding" than the Rule 23(a) requirements, *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

Plaintiffs argue, and Defendants again do not specifically challenge, that Defendants implemented a common policy that applied to all class members by "fail[ing] to pay overtime of at least one and one-half times the regular rate, and [failing to] provide required [wage] notices and statements." (Pls.' Class Cert. Mem. 10.) The Court agrees. "The question of whether class members were properly paid can be addressed by class-wide proof regarding the defendants' payroll records, financial records, and testimony." *Zivkovic*, 329 F.R.D. at 75. "Indeed, courts in this [d]istrict have found that the types of individual questions that exist in wage-and-hour cases, such as the hours worked or the exact damages to which each plaintiff might be entitled, are inevitable and do not defeat the predominance requirement." *Id.* (quotation marks and alterations omitted); *see also Iglesias-Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363, 373 (S.D.N.Y. 2007) ("Some factual variation among the circumstances of the various class members is inevitable and does not defeat the predominance requirement."). In *Iglesias-Mendoza*, the

court found that the issues of whether the class members were entitled to minimum wage and overtime were "about the most perfect questions for class treatment." *Iglesias-Mendoza*, 239 F.R.D. at 373.  The Court reaches the same conclusion here.

e. Superiority

Finally, a proposed class must satisfy the superiority requirement, which necessitates a finding that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  In making this determination, courts consider "the interest of the members of the class in individually controlling the prosecution or defense of separate actions" and "the difficulties likely to be encountered in the management of a class action."  *Id.*; *see also Iglesias-Mendoza*, 239 F.R.D. at 373 (same).

Plaintiffs argue, and Defendants again do not specifically dispute, that the superiority requirement is met because the "class members suffered from policies in violation of NYLL, but no individual's damages are likely to justify a separate action."  (Pls.' Class Cert. Mem. 11.)  In *Iglesias*, the court found that the superiority requirement was satisfied where the "proposed class members are almost exclusively low-wage workers with limited resources and [weak] command of the English language or familiarity with the legal system," because it was "extremely unlikely that they would pursue separate actions."  *Iglesias-Mendoza*, 239 F.R.D. at 373.  In *Hardgers-Powell*, the court found that "[a] class action is [] the superior method because of the small damages suffered in relation to the expense of individual litigation, the efficiency of resolving the NYLL [o]vertime claim with the FLSA [o]vertime claim, and the absence of any significant difficulties in managing the class action."  *Hardgers-Powell*, 330 F.R.D. at 106.  In *Mujo*, the court found that the superiority requirement was satisfied where "[c]urrent class members may [] still work for [the defendant], raising the possibility of retaliation for the filing of individual

claims," where "the individual claims are too small to bring absent the class action," and where "a class would eliminate the risk that individual lawsuits would have different outcomes for common questions of law and fact that predominate the class members."  *Mujo*, 2019 WL 145524, at *6; *see also Trinidad v. Breakaway Courier Sys., Inc.*, No. 05-CV-4116, 2007 WL 103073, at *9 (S.D.N.Y. Jan. 12, 2007) (finding class action litigation to be superior where the average claim was $560 and some class members currently worked for the defendant); *Torres v. Gristede's Operating Corp.*, No. 04-CV-3316, 2006 WL 2819730, at *16 (S.D.N.Y. Sept. 29, 2006) (finding the superiority requirement was met where litigation costs were likely to exceed any recovery and some class members were still employed with the defendants).  Here, the Court finds that the superiority requirement is satisfied for the same reasons as the courts in *Iglesias-Mendoza*, *Hardgers-Powell*, and *Mujo*.

The Court therefore finds that Plaintiffs have satisfied all of the necessary Rule 23 requirements.  Accordingly, the Court grants Plaintiffs' Motion for Class Certification.

<u>III. Conclusion</u>

For the reasons set forth above, Plaintiffs' Motion for Class Certification and Final

Certification of the Collective Action is granted in full.  Plaintiffs' Motion for Summary

Judgment is granted in part and denied in part.  Defendants' Motion for Summary Judgment is

denied in full.  The Clerk of Court is respectfully requested to terminate the pending Motions.

(Dkt. Nos. 287, 289, 296, 320, 324.)

SO ORDERED.

DATED:          March 30, 2022
               White Plains, New York

                                        _____
                                        KENNETH M. KARAS
                                        UNITED STATES DISTRICT JUDGE